UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KHALAIRE ALLAH,

               Plaintiff,

-against-

DAVID S. DINELLO, et al.,

               Defendants.

No. 23-CV-3286 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are 17 motions for summary judgment filed by various Defendants in 12 related cases.  Individual Plaintiffs have opposed each motion for summary judgment.  For the reasons set forth below, certain of Defendants' motions are GRANTED, and certain of Defendants' motions are DENIED.

## I.  **Background**

### A.  **Factual Background**

The Court assumes familiarity with its decision in related case Allen v. Mueller, No. 23-CV-5651, 2024 WL 3090141 (S.D.N.Y. June 21, 2024).  A streamlined version of the relevant facts and procedural history follows.

The above-captioned case arises from a class action brought by several named New York State Department of Corrections and Community Supervision ("DOCCS") inmates on behalf of a class of individuals in DOCCS custody whose medications were denied or discontinued after the institution of the Medications With Abuse

Potential ("MWAP") Policy.  See Allen v. Koenigsmann, No. 19-CV-8173, 2023 WL 2731733 (S.D.N.Y. Mar. 31, 2023).[1]  (See also Allen I, Plaintiff's Memorandum of Law in Support of Motion for Class Certification, dated May 19, 2022 ("Pl. Class Cert. Br.") [19-CV-8173, dkt. no. 371] at 21.)[2]

DOCCS adopted the MWAP Policy in June 2017.  (See Stewart v. Mueller, Defendant Mueller's Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 15, 2023 ("Mueller 56.1 Stmt.: Stewart) [23-CV-5668, dkt. no. 19] ¶ 3.)  The MWAP Policy required any DOCCS medical provider who sought to prescribe certain medications to submit an "MWAP Request" to the DOCCS Regional Medical Director ("RMD") in charge of the medical provider's facility.  (See id. ¶ 5.)  Before the DOCCS medical provider had authority to prescribe the requested medication for long-term use for chronic conditions, the RMD had to approve the MWAP Request. (See id.)

The stated purpose of the MWAP Policy was to control the prescriptions of medications that DOCCS believed might carry the risk of abuse or dependence by DOCCS inmates.  (See Rivera-Cruz v.

---

[1] The Court will refer to the class action, 19-CV-8173, as "**Allen I**."
[2] Unless otherwise noted, page numbers cited herein reflect ECF page numbers, rather than page numbers of the parties' submissions. The Court will also cite page numbers using the various methods of pagination used by the parties in their exhibits (such as MD 000406); in such instances the Court will add an asterisk "*" before the pagination.

Mueller, Declaration of A.J. Agnew in Opposition to Motion for Summary Judgment, dated December 27, 2023 ("Rivera-Cruz, Agnew Decl.") [23-CV-5657, dkt. no. 29], Ex. 23 [23-CV-5667, dkt. no. 29-25] at 2.)  Medications that required RMD approval under the MWAP Policy included Gabapentin (Neurontin), Lyrica (Pregabalin), Baclofen, Flexeril (Cyclobenzaprine), Ultram (Tramadol), Percocet, and Oxycodone.  (See Mueller 56.1 Stmt.: Stewart ¶ 6.)  DOCCS rescinded the MWAP Policy on February 8, 2021.  (See State Represented Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated November 16, 2023 ("SRD 56.1 Stmt.: Gradia") [23-CV-5660, dkt. no. 24] ¶ 6.)

Plaintiffs in the class action asserted claims under 42 U.S.C. § 1983 alleging deliberate indifference to their medical needs due to DOCCS' implementation of the MWAP Policy and the discontinuation and denial of their medications that ensued.  (Allen I, Second Amended Complaint, dated December 12, 2020 [19-CV-8173, dkt. no. 256] at 137-40.)  Plaintiffs moved for class certification and for a preliminary injunction seeking relief from the ongoing effects of the MWAP Policy, arguing that DOCCS was continuing to deny effective treatment to patients who had lost their medications due to the MWAP Policy.  (Allen I, Pl. Class Cert. Br. at 21-22; Allen I, Plaintiff and Plaintiff-Intervenors' Memorandum of Law in Support of Motion for Injunctions, dated May 31, 2022 [19-CV-8173, dkt. no. 378] at 8-9.)

On March 31, 2023, this Court issued an Opinion granting the Allen I plaintiffs' motion to certify a class to pursue injunctive relief but denying the Plaintiffs' motion to certify a class to pursue damages.  See Allen I, 2023 WL 2731733, at *6.  The Court held that plaintiffs in Allen I had failed to show that the proposed "liability class" had standing to sue under Article III of the United States Constitution.  See id. at *2-3.

Also on March 31, 2023, the Court granted the Allen I plaintiffs' motion for a preliminary injunction, determining plaintiffs had demonstrated ongoing constitutional violations, including medically unjustified discontinuations of MWAP treatment and a likelihood of imminent future harm across the class.  Allen I, 19-CV-8173, 2023 WL 2752375, at *22-23 (S.D.N.Y. Mar. 31, 2023).

After a four-day bench trial, this Court converted the preliminary injunction into a permanent injunction, concluding that remedying the constitutional violations in DOCCS' pain management practices outweighed the administrative challenges DOCCS would face in implementing a permanent injunction.  Allen I, 700 F. Supp. 3d 110, 145 (S.D.N.Y. 2023).  The Court then awarded attorneys' fees to Plaintiffs' counsel.  (Allen I, Order, dated February 22, 2024 [19-CV-8173, dkt. no. 850] at 1.)

The Court of Appeals affirmed this Court's decision to grant a permanent injunction and award Plaintiffs' counsel attorneys' fees.  Daniels et al. v. Moores, No. 24-30-pr, 2025 WL 883035, at

4

*1 (2d Cir. Mar. 21, 2025) (summary order).  The Court of Appeals credited the Court's determination that "the MWAP Policy was still de facto in place, despite being formally rescinded, because prisoners in DOCCS custody continued to have their MWAP medications systematically denied without medical justification and without regard to medical need."  (Id. at *2.)  In addition, the Court of Appeals found no error in the Court's conclusion that Plaintiffs suffered Eighth Amendment violations and therefore irreparable harm.  (Id. at *2-3.)  In so holding, the Court of Appeals reiterated that "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians" and where defendants "reflexively rel[ied] on . . . the substance abuse policy when they had been put on notice that the medically appropriate decision could be, instead, to depart from the [policy] and prescribe [the medication] to the plaintiff."  (Id. at *3 (citing Johnson v. Wright, 412 F.3d 398, 404, 406 (2d Cir. 2005).)

Following this Court's denial of certification of a "liability class," various plaintiffs filed individual suits for damages against various DOCCS employees, including RMDs, physicians, physician assistants, and nurse practitioners ("NPs"). (See, e.g., Amended Complaint as Severed from Allen I, filed June 30, 2023 ("AC: Daniels") [23-CV-5654, dkt. no. 1] at 3-5.)  Similar to the allegations made in the class action, these plaintiffs each

alleged violations of 42 U.S.C. § 1983 based on deliberate indifference to their medical needs. (See, e.g., id. ¶¶ 349-72.)

## II.  Legal Standard

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'It is the movant's burden to show that no genuine factual dispute exists.'" I.M. v. United States, 362 F. Supp. 3d 161, 189 (S.D.N.Y. 2019) (quoting Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of N.Y., 746 F.3d 538, 544 (2d Cir. 2014) (quoting Liberty Lobby, Inc., 477 U.S. at 248).

"'In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'" In re AXA Equitable Life Ins. Co. COI Litig., 595 F. Supp. 3d 196, 215 (S.D.N.Y. 2022) (quoting Goenaga v. March of Dimes Birth

6

Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)).  In ruling on a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

"If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" Kayo v. Mertz, 531 F. Supp. 3d 774, 787 (S.D.N.Y. 2021) (quoting Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)). "The non-moving party 'cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'"  In re AXA, 595 F. Supp. 3d. at 215 (quoting Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)).  The non-moving party must "create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'"  Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

## III.  <u>Applicable Law</u>

### A.    Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits government officials from inflicting "cruel and unusual punishments" on those in their care.  U.S. Const. amend. VIII. Pursuant to the right to be free from cruel and unusual punishments, the Eighth Amendment prohibits prisons officials from acting with "deliberate indifference to serious medical needs of prisoners[.]"  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).

A prison official can be held liable for deliberate indifference in violation of the Eighth Amendment "only when two requirements are met."  <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotations and citations omitted), <u>abrogated in part on other grounds by</u> <u>Kravitz v. Purcell</u>, 87 F.4th 111 (2d Cir. 2023).  The first requirement the plaintiff must meet "is objective:  the alleged deprivation of adequate medical care must be 'sufficiently serious.'"  <u>Id.</u> (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)).  The second requirement "is subjective: the charged official must act with a sufficiently culpable state of mind."  <u>Id.</u> at 280.  Put differently, a plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs."  <u>Brock v. Wright</u>, 315 F.3d 158, 162 (2d Cir. 2003) (citing <u>Estelle</u>, 429 U.S. at 104).

8

Satisfying the objective prong entails two inquires.  First, the Court must assess "whether the prisoner was actually deprived of adequate medical care."  Salahuddin, 467 F.3d at 279.  The second part of the objective inquiry asks whether the deprivation or inadequacy of the plaintiff's medical care is "sufficiently serious."  Id. at 280.

Determining if the deprivation of medical care is sufficiently serious is "necessarily contextual and fact-specific" which requires "tailor[ing] [it] to the specific circumstances of each case."  Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (cleaned up) (internal quotations and citations omitted).  This includes examining the plaintiff's claim differently depending on whether he alleges the prison officials completely "fail[ed] to provide any treatment for [his] medical condition" or alleges only that the medical treatment he received was inadequate.  See Salahuddin, 467 F.3d at 280.

If the former, the Court must "examine whether the inmate's medical condition is sufficiently serious."  Id. at 280 (emphasis added).  Certain factors courts consider when evaluating the seriousness of a medical condition include whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," or "the existence of chronic and substantial pain."  Chance v. Armstrong, 143 F.3d 698,

9

702 (2d Cir. 1998) (internal quotations and citations omitted). If, however, the plaintiff alleges only "inadequacy [] in the medical treatment [he was] given, the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. Instead of determining the seriousness of the plaintiff's underlying condition, the Court must focus its inquiry "on the challenged delay or interruption in treatment[.]" Id. (citing Smith, 316 F.3d at 185). Such inquiry requires the Court to examine "the particular risk of harm" the plaintiff faced as a result of the deprivation, "rather than the severity of the [plaintiff's] underlying medical condition[.]" Smith, 316 F.3d at 186.

Accordingly, the Court inquires how serious the plaintiff's underlying medical condition is if he alleges he was entirely denied care, whereas it must assess the "particular risks attributable" to a provision of allegedly insufficient care or the "severity of [a] temporary deprivation" in care if that is the deprivation the plaintiff alleges. Id. at 186-87 (emphasis added).

To satisfy the subjective prong, i.e., to prove a prison official was deliberately indifferent to his or her medical needs, a plaintiff must "show that a particular defendant 'knows of and disregards an excessive risk to inmate health or safety.'" Brock, 315 F.3d at 164 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). This standard is akin to a mental state of subjective

10

recklessness, as used in criminal law. See Salahuddin, 467 F.3d at 280. The plaintiff may demonstrate the defendant's knowledge either by proving the official had actual knowledge of the risks to the plaintiff's health or by proving "that the risk was obvious or otherwise must have been known to [the] defendant[.]" Brock, 315 F.3d at 164.

## B. Personal Involvement

Plaintiffs assert their Eighth Amendment claims pursuant to 42 U.S.C. § 1983. To prevail on a § 1983 claim for a constitutional violation, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). Thus, to establish a particular defendant's liability, a plaintiff must "establish that [the particular defendant] violated the Eighth Amendment by [his or her] own conduct, not by reason of [his or her] supervision of others who committed the violation" and that each particular defendant "knew of and disregarded an excessive risk to [Plaintiffs'] health or safety." Id. at 619 (citing Vega v. Semple, 963 F.3d 259, 273 (2d Cir. 2020)).

Such personal involvement requires "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional

practices occurred[.]" Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

### C. Qualified Immunity

The Supreme Court has held that "[g]overnment officials are entitled to qualified immunity [from liability] with respect to 'discretionary functions' performed in their official capacities." Ziglar v. Abbasi, 582 U.S. 120, 150 (2017) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). Whether a government official can invoke qualified immunity "turns on the 'objective legal reasonableness' of the official's acts." Id. at 151 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). The reasonableness of the official's actions "must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" Id. (quoting Creighton, 483 U.S. at 639).

To determine whether the official violated rights that were "clearly established," the Court "must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." Id. at 151-52 (internal quotations and citations omitted). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[,] then the officer is immune from liability." Id. at 152. As the Supreme Court phrased differently in a previous case, the "right must be sufficiently clear that every reasonable official would

have understood that what he [was] doing violate[d] that right." Taylor v. Barkes, 575 U.S. 822, 825 (2015) (internal quotations and citations omitted).

When confronted with the qualified immunity defense, the Court must determine the scope of the right that the plaintiff asserts was clearly established and that the official violated that right.  There need not exist "a case directly on point" that addresses facts perfectly analogous to the instant case before the Court, "but existing precedent must have placed the statutory or constitutional question beyond debate."  Id. (internal quotations and citations omitted).  In other words, "the precise conduct at issue need not previously have been ruled unlawful" for the Court to conclude that the right was clearly established.  Griffin v. Amatucci, 611 F. App'x 732, 734 (2d Cir. 2015) (summary order) (citing Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000)).  As the Court of Appeals has noted in the specific context of claims of deliberate indifference in violation of the Eighth Amendment, assertions of qualified immunity "are not analyzed body-part by body-part" or with "specificity as to the site and cause of pain[.]"  Collymore v. Myers, 74 F.4th 22, 30 (2d Cir. 2023).  Such a "restricted view of the right" alleged to have been violated would be unnecessarily narrow in determining whether the right was clearly established at the time of its alleged violation.  See LaBounty v. Coughlin, 137 F.3d 68, 74 (2d Cir. 1998).

13

On the other hand, "the clearly established right must be defined with specificity," and the "dispositive question is whether the violative nature of <u>particular</u> conduct is clearly established."   <u>Vega</u>, 963 F.3d at 275 (emphasis in original) (internal quotations and citations omitted).  Accordingly, the Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition."  <u>Id.</u>  In the context of claims for deliberate indifference, this means "'sufficiently serious' medical conditions 'should not be defined at a high level of generality.'"  <u>Collymore</u>, 74 F.4th at 30 (quoting <u>White v. Pauly</u>, 580 U.S. 73, 79 (2017)).

## IV. <u>Discussion</u>

The Court will evaluate the summary judgment motions pending in 13 <u>Allen I</u> Individual Plaintiff actions for deliberate indifference.

### A. Plaintiff Allah's Claim: 23-cv-3286[3]

In this matter, Dr. David Dinello and NPs Rebecca Fears, Valerie Monroe, and Lara Osika-Michales move for summary judgment. (S.D.N.Y. 23-cv-3286, dkt. nos. 177 [Dinello Mot.], 182 [Fears, Monroe, and Osika-Michales Mot.]).  Plaintiff Khalaire Allah opposes the motion. (23-cv-3286, dkt. no. 202.)  Defendants have

---

[3] All docket number mentioned in this section refer to 23-CV-3286.

replied.  (23-cv-3286, dkt. nos. 204 [Dinello Reply], 207 [Fears, Monroe, and Osika-Michales Reply].)

As an initial matter, while Defendnats move for the Court to strike portions of Plaintiff's Rule 56.1 counterstatement and declarations of Plaintiff Allah, the Court declines to do so.  See Primmer v. CBS Studios, Inc., 667 F. Supp. 2d 248, 254 (S.D.N.Y. 2009) ("This Court has broad discretion to accept [a litigant's] 56.1 counterstatement, even if it does not comply strictly with the Rule's requirements.").

Plaintiff Allah suffers from carpal tunnel syndrome in his right arm from a gunshot wound, back pain, and migraines.  (Id. at 18; Agnew Decl., Ex. 23 [dkt no. 197-23] at 7, 12, 20).  He has a documented history of neuropathy, wrist pain, and a need for pain management in his medical records dating back to 2008.  (Agnew Decl., Ex. 25-3 [dkt. no. 30] at 6).  Plaintiff began taking Neurontin for nerve damage in his wrist in or about 2008. (Defendant Dinello's Local Civil Rule 56.1 Statement of Undisputed Facts, dated May 23, 2025 ("Dinello SUF") [dkt. no. 178] ¶ 10; Transcript of Deposition of Khalaire Allah ("Allah Tr.") [dkt. no. 187-2] at 17:8-23.)  As a result of the neuropathy in his right hand, Plaintiff experiences chronic pain affecting his ability to perform simple tasks.  (23-cv-3286, Dinello SUF ¶ 13; Pl. Opp'n at 18-19.)  In September 2015, after being admitted to Albany Medical Center for rhabdomyolysis, Dr. Dinello approved a prescription for

15

Neurontin 600mg three times daily dose because Plaintiff "ha[d] [a] documented medical reason." (Cha Decl., Ex. C [dkt. no. 180-3] at 10; Dinello SUF ¶ 20; Pl. Opp'n at 19). In 2016, Plaintiff began receiving Neurontin 600 twice daily. (Dinello SUF ¶ 21; Cha Decl., Ex. 3 at 2.) In June 2017, after MWAP was instituted, Plaintiff's prescription for Neurontin was denied by Dr. Bozer. (Dinello SUF ¶ 30; Agnew Decl., Ex. 27 [dkt. no. 197-32] at 2-3.) In 2018, an EMG performed on Plaintiff confirmed "moderate to severe" carpal tunnel syndrome and "mild right radial sensory neuropathy." (Agnew Decl., Ex. 22 [dkt. no. 197-22] at 6.)

Plaintiff's claim against Dr. Dinello concerns his denial of a March 2, 2020, MWAP request by Plaintiff's treating provider, Richard Slagle, for Neurontin to treat Plaintiff's right-hand neuropathy. (Pl. Opp'n at 19; Agnew Decl., Ex. 23 at 8-9.) Dr. Dinello asserts that he denied the request because he did not believe there is evidence "Neurontin is an effective treatment" for Plaintiff's Neuropathy and that he understood Neurontin to be an extremely problematic medication" with a "well-documented history of diversion and misuse within NYS DOCCS." (Dinello SUF ¶ 33-34; Declaration of Dr. David S. Dinello, dated May 22, 2025 ("Dinello Decl.") [dkt. no. 179] ¶ 28, 29.) He also asserts his decision was based on Plaintiff's "long history of diverting and overdosing on medication," which informed his decision to recommend "that Plaintiff be treated with non-habit-forming

16

medication with a safe profile, such as Valproic Acid, Phenytoin, Carbamazepine or Oxcarbazepine. . . and also. . . Plaintiff [] be evaluated for surgery." (Dinello Decl. ¶ 31, 33; Dinello SUF ¶ 35-36.)

### 1. Dr. Dinello: Denied

Initially, although the Complaint mentions the denial of pain medications by Dr. Dinello on a variety of dates (see, e.g., Complaint, dated April 19, 2023 [dkt. no. 1]; Dinello SJ at 3, 8-9), Plaintiff's Memorandum of Law in Opposition to the motion for summary judgment clarifies that Plaintiff does not maintain earlier claims barred by the statute of limitations and is only pursuing the 2020 denial by Dr. Dinello (see Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, dated August 1, 2025 ("Pl. Opp'n") [dkt. no. 202] at *18 n.3). Accordingly, the Court will limit its discussion to the 2020 denial.

Dr. Dinello asserts in his declaration that there "is no documented evidence that Neurontin is an effective treatment" and that it is an "extremely problematic medication" with abuse potential. (Dinello Decl. ¶¶ 28-29.) Yet, such claims are contradicted by his testimony and other physicians at DOCCS' —— Drs. Cahill and Weinstein —— testimony. Dr. Dinello stated that he uses Neurontin "as recommended by the Physician Desk Reference" ("PDR"), which he admits dictates that Neurontin is indicated for

17

"moderate to severe neuropathy" the exact condition Plaintiff suffered from. (See Agnew Decl., Ex. 6, Dr. Dinello Tr. [dkt. no. 197-6] at 48:17-22; Agnew Decl., Ex. 7, Dr. Dinello Tr. [dkt. no. 197-7] at 37:25-38:4.) Indeed, there is evidence that in the medical community Neurontin is considered as a standard first-line treatment for Plaintiff's neuropathy with a low risk of abuse and is frequently used to treat pain to avoid reliance on opioids. (Agnew Decl., Ex. 15, Transcript of Deposition of Dr. Steven Weinstein ("Dr. Weinstein Tr.") [dkt. no. 197-15] at 91:2-6, 101:3-8; Agnew Decl., Ex. 3, Transcript of Deposition of Dr. Gerald Cahill ("Dr. Cahill Tr.") [dkt. no. 197-3] at 90:11-16; see also Agnew Decl., Ex. 4 [dkt. no. 197-4] at 9 (peer reviewed paper listing Neurontin as an effective treatment for neuropathic pain).) There is evidence that Dr. Dinello followed this guidance prior to the institution of MWAP when he approved Plaintiff's 2015 prescription because he "has a documented reason," while denying the more problematic Oxycodone. (Cha Decl., Ex. 3 at 10; Dinello SUF ¶ 20.)

While Plaintiff does not contest his history of overdoses and drug diversion, there is evidence that these risks can be mitigated by one-to-one supervised administration and crush orders. (Agnew Decl., Ex. 10, Transcript of Deposition of Dr. Carl Koenigsmann ("Dr. Koenigsmann Tr.") [dkt. no. 197-10] at 49:21-50:5; Agnew Decl., Ex. 6, Dr. Dinello Tr. at 45:16-46:15.) Additionally, there

18

is evidence that there was never any data collected to support the claim that Gabapentin was highly abused in DOCCS.  (Dr. Koenigsmann Tr., 50:12-18 (there was no specific data collected on which medications were most frequently abused in DOCCS); Dr. Dinello Tr., 67:13-22 (when asked whether there was any data collected to analyze drug diversion, Dinello replied "No concrete data, just subjective from the staff.").)

Thus, this issue is sufficiently contested such that a reasonable jury could find that Dr. Dinello's denial was made by "reflexively" relying on the MWAP policy and not based on his sound medical judgment.  Daniels v. Mueller et al., 2025 WL 949842, at *9 (S.D.N.Y. Mar. 28, 2025).

As to qualified immunity, the Court adopts its previous holding in that "inmates have an Eighth Amendment right not to have prison officials rely on a policy to reject a request for a medication when the officials know it might be medically appropriate to prescribe the medication instead."  Daniels, 2025 WL 949842, at *26.  Moreover, because there are disputed facts on the basis of reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity. See Daniels, 2025 WL 949842, at *27; see also Husain v. Springer, 494 F.3d 108, 133 (2d Cir. 2007) ("[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

19

Accordingly, Dr. Dinello's motion for summary judgment in 23-cv-3286 is DENIED.

### 2.    NP Osika-Michales: Denied

Defendant NP Osika-Michales submits that she "did not believe that it would be beneficial to [Plaintiff] to trial any new pain medication" because "[a]ll pain medications used in the past had been ineffective, as reported by [Plaintiff]" and she believed that physical therapy would have been effective but for "poor compliance from [Plaintiff]." ([Non-State Represented] Defendants' Local Rule 56.1 Statement of Undisputed Facts, dated May 23, 2025 ("Allah NSSUF") [dkt. no. 183] ¶ 10; Declaration of Laura Osika-Michales ("Osika-Michales Decl.") [dkt. no. 186] ¶ 14.)  Plaintiff, in his deposition, states that he explicitly requested Osika-Michales prescribe him Neurontin.  (Allah Tr. at 284:2-19.)  A review of Plaintiff's medical record reveals that there was a MWAP for Neurontin that was denied on March 2, 2020, prior to Defendant's MWAP reassessment, which occurred on October 20, 2020.  (Agnew Decl., Ex. 23 at 8-9.)  There is also evidence that the earlier MWAP request also reveals that Elavil and occupational therapy had previously failed adequately to address Plaintiff's pain and that Neurontin may have been appropriate.  (Id. (listing attempted treatments).)  Despite this information, Defendant only continued Plaintiff on Elavil and occupational therapy.  (Id. at 13.)  This is sufficient to suggest reasonably that Defendant's

20

failure to prescribe Neurontin was, as in Daniels, based on reflexive adherence to the MWAP policy and not due to her informed medical judgment.

The Court also finds that because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity. Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, NP Osika-Michales' motion for summary judgment in 23-cv-3286 is DENIED.

### 3.   NP Fears: Denied

Similarly, Defendant NP Fears requests dismissal on the grounds that she did not refuse to prescribe Neurontin because Plaintiff never requested it.  (Manley SJ at 9.)  Plaintiff claims that he asked Fears to be reinstated on Neurontin and that she told him that she could not do that because of "Albany . . . [t]hey don't allow use to have certain medications."  (Allah Tr. at 245:9-246:9.)  Plaintiff's records from his time at Elmira show that he requested pain medication several times and filed a formal complaint requesting treatment for his pain.  (Agnew Decl., Ex. 24-2 [dkt. no. 26] at 2.)  This along with Plaintiff's documented neuropathy, for which Neurontin is considered a first line treatment, the previous MWAP request for Neurontin, and evidence on his medical records showing that Elavil was not an effective treatment (Agnew Decl., Ex. 23 at 8; Osika-Michales Decl., Ex. 1

21

[dkt. no. 186-1] at 3-4) supports Plaintiff's claims that he requested Neurontin and Fears denied it due to her "reflexive" reliance on the MWAP policy.  The Court also finds that because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity.  Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, NP Fears' motion for summary judgment in 23-cv-3286 is DENIED.

### 4.    NP Monroe: Denied

Defendant NP Monroe requests summary judgment because she referred Plaintiff to multiple specialists and his pain was ultimately helped by Lyrica on February 16, 2022.  (Manley SJ at 11.)  While both these assertions are not in dispute, they do not address why Plaintiff was not given effective treatment when in November, Dr. Holder recommended "Neurontin 300mg [three times per day]," (Agnew Decl., Ex. 24-2 at 15), and in December, Dr. Magill instructed Plaintiff to "continue Neurontin," (Agnew Decl., Ex. 24-3 [dkt. no. 27] at 6).  Monroe does not sufficiently address why she ignored the recommendations of two separate physicians. Monroe cites Plaintiff's previous medication diversions and suicidal ideation as a reason she did not prescribe Neurontin and instead sought advice from a pain management specialist.  (Manley SJ at 11.)  As mentioned above, medication diversion can be

22

addressed by one-on-one administration and crush orders.  (Dr. Koenigsmann Tr. at 49:21-50:5; Agnew Decl., Ex. 6, Dr. Dinello Tr. at 45:16-46:15.)  Notwithstanding what course of treatment was recommended by the pain management specialist, there is no suggestion on the record that the pain specialist counseled against Neurontin.  (Declaration of Valerie Monroe, dated May 14, 2025, ("Monroe Decl.") [dkt. no. 185] Ex. A [dkt. no. 185-1] at 42 (the report refers to "Medication??" indicating that further investigation may have been required but not suggesting that any particular medication is not warranted).)  While the ganglion block surgeries on December 8 and 22 provided some temporarily relief for Plaintiff's pain for "a few weeks," (Monroe Decl. ¶ 26, Ex. A Part II [dkt. no. 185-2] at 12), it does not explain why Plaintiff was denied MWAP until the pain management specialist recommended Pregabalin, a drug in the same class as Neurontin, on February 16 (Monroe Decl. ¶ 30, Ex. A Part III [dkt. no. 185-3] at 4).

This Court concludes that a reasonable jury could find that Defendant Monroe's conduct constituted deliberate indifference by "ignor[ing] the medical recommendations of a prisoner's treating physicians" and refusing to prescribe Neurontin and, instead, "reflexively" relying on the MWAP policy.  Daniels et al. v. Moores, 2025 WL 883035, at *3 (2d Cir. Mar. 21, 2025) (summary order) (citing Johnson v. Wright, 412 F.3d 398, 404, 406 (2d Cir. 2005)).

The Court also finds that because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity. Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, NP Monroe's motion for summary judgment in 23-cv-3286 is DENIED.

### B. Plaintiff Alston's Claim: 23-cv-3290

In this matter, PA Kathryn Infantino moves for summary judgment. (S.D.N.Y. 23-cv-3290, dkt. nos. 130 [Infantino Mot.], 134 [Infantino MOL].) Plaintiff John Alston opposes the motion. (23-cv-3290, dkt. no. 153 [Alston Opp.].) Defendant Infantino has replied. (23-cv-3290, dkt. no. 154 [Infantino Reply].)

As an initial matter, while PA Infantino moves for the Court to strike portions of Alston's Rule 56.1 counterstatement, (23-cv-3290, dkt. no. 154 at 1-2), the Court declines to do so. See Primmer, 667 F. Supp. 2d at 254.

#### 1.   PA Infantino: Denied

John Alston is a 65-year-old incarcerated individual with a long history of lower left extremity neuropathic pain, confirmed by multiple EMGs, stemming from an arterial clot and thrombectomy in May 2005. (Agnew Decl., Ex. 22 [23-cv-3290, dkt. no. 149-22] at J ALSTON *2-4.) For over a decade, Alston complained of back pain, and Neurontin was repeatedly prescribed. (Id. at J ALSTON *11-16, , 82-83.) In May 2020, Alston was diagnosed with extensive

24

acute deep vein thrombosis in his lower left extremity.  (Agnew Decl. Ex. 23 [23-cv-3290, dkt. no. 149-28] at *123.)

On May 11, 2020, Alston was discharged from Putnam Hospital to the Green Haven Infirmary.  (Agnew Decl. Ex. 23 at *116.) PA Infantino served as his primary care provider when he was housed in the infirmary and saw him almost every day during morning rounds.   (Alston Tr. [23-cv-3290, dkt. no. 133-2] at *156:18–158:23; 162:22–163:11; Alston SUF [23-cv-3290, dkt. no. 146] ¶¶ 1, 9, 26.)

On May 12, 2020, Alston complained directly to PA Infantino of pain in his lower left leg.  (Agnew Decl. Ex. 23 [23-cv-3290, dkt. no. 149-29] at *175.)  The following day, PA Infantino noted Alston was refusing assessment, vital signs, and medications, stating "I am in pain."  (Agnew Decl. Ex. 23 [23-cv-3290, dkt. no. 149-30] at *176.)  That same day, PA Infantino submitted an MWAP form requesting tramadol for three days under COVID protocol, which was approved.  (Agnew Decl. Ex. 23 [23-cv-3290, dkt. no. 149-28] at *118, 120-21.)  Alston continued to report pain on May 14, 20, and 22, 2020, including directly to PA Infantino on May 14.  (Agnew Decl. Ex. 23 [23-cv-3290, dkt. no. 149-30] at *176, 181, 204, 213.) Alston was discharged from the infirmary on May 26, 2020.  (Id. at *226.)

PA Infantino filled Alston's prescriptions for Meloxicam and Tylenol for pain.  (Agnew Decl. Ex. 23 [23-cv-3290, dkt. no. 149-

25

32] at *283; Alston SUF ¶ 4.)  However, Alston reported that Meloxicam provided no pain relief whatsoever and that Tylenol reduced his pain only modestly.  (Alston Tr. at 108:25–109:3; 111:10–112:19; Alston SUF ¶ 4.)  Moreover, despite receiving these medications, Alston continued to advise providers he was in pain. (Agnew Decl. Ex. 23 at *297; Alston SUF ¶ 4.)

On August 28, 2020, Alston was readmitted to the Green Haven infirmary for a mobility assessment.  (Alston SUF Response ¶ 2.) On September 3, 2020, a physical therapist evaluated Alston and recorded that he complained of "burning" pain in his lower left extremity during ambulation, traveling from the bottom of his left foot up posteriorly.  (Alston SUF ¶¶ 5, 6.)  The physical therapist recommended continued wheelchair use for long distances for two to three months, noting Alston had been performing his own rehabilitation in the yard using his wheelchair as a walker. (Alston SUF ¶¶ 6, 7.)  PA Infantino would remind Alston during this period that he needed to ambulate consistent with the PT plan. (Alston SUF ¶ 11.)

On October 1, 2020, cardiologist Dr. Tartaglia evaluated Alston at the request of NP Acrish for a pacemaker checkup. (Alston SUF ¶ 13.)  Dr. Tartaglia noted the presence of neuropathic pain and recommended Neurontin, explaining a preference for it over tricyclic antidepressants given Alston's posterior wall arrhythmia, while also noting Cymbalta as an alternative.  (Alston

26

SUF ¶ 14.)  Dr. Tartaglia further noted that the potential for addiction to Neurontin was low.  (Agnew Decl. Ex. 23 [23-cv-3290, dkt. no. 149-34] at *354.)

PA Infantino prescribed Cymbalta on October 5, 2020, after consulting with Alston's then primary care provider, NP Acrish. (Alston SUF ¶ 15.)

Mr. Alston testified that "Cymbalta wasn't working for me" at that time.  (Alston Tr. [23-cv-3290, dkt. no. 133-2] 107:24 – 108:3.)  After the prescription was issued on October 5, 2020, medical records reflect five separate instances in which Mr. Alston reported ongoing pain before his discharge from the Green Haven infirmary on October 21, 2020.  (Agnew Decl. Ex. 23 [23-cv-3290, dkt. nos. 149-32, 149-35] at * 285, 366, 372, 377, 378.)

During this period, PA Infantino did not prescribe an alternative pain medication such as Neurontin.  (Id.)  Mr. Alston also testified that he informed Infantino while in the infirmary that he wished to resume Neurontin and that the medications he was receiving were not alleviating his symptoms.  (Alston Tr. 178:21 – 179:11.)

Alston continued receiving Cymbalta until April or May 2021. (Ex. 25 [23-cv-3290, dkt. no. 149-41] at *23-27.)  Through the Allen I litigation, Alston was prescribed Neurontin on or around May 12, 2021.  (Agnew Decl. Ex. 24 [23-cv-3290, dkt. no. 149-37] at *16, 20-21.)

27

Moreover, on October 21, 2020, PA Infantino and another medical provider simultaneously documented notes and while the other provider recorded that Mr. Alston reported pain, PA Infantino noted that he had no complaints.  (Alston SUF ¶ 10; Agnew Decl. Ex. 23 [23-cv-3290, dkt. no. 149-35] at *378.)

The Court finds that based on this record, a jury could find that PA Infantino acted with deliberate indifference.

The Court also finds that because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity. Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, PA Infantino's motion for summary judgment in 23-cv-3290 is DENIED.

## C. Plaintiff Batista-Cruz's——as administratrix of the Estate of Roderick Reyes——Claim: 23-cv-3315

In this matter, Dr. John Hammer moves for summary judgment. (S.D.N.Y. 23-cv-3315, dkt. nos. 134 [Hammer Mot.], 138 [Hammer MOL].)  Plaintiff Christabel Batista-Cruz, as administratrix of the estate of Roderick Reyes, opposes the motion. (23-cv-3315, dkt. no. 173 [Reyes Opp.].)  Defendant Hammer has replied. (23-cv-3315, dkt. no. 178 [Hammer Reply].)

### 1.   Dr. Hammer: Denied

Mr. Reyes' medical history included sickle cell disease and anemia, avascular necrosis, chronic kidney disease, hepatitis,

28

gout, hypertension, and sickle cell crisis pain.  (SUF [23-cv-3315, dkt. no. 172 ¶ 8.)  He began opioid therapy at ages eighteen or nineteen to manage chronic pain, and with medication his pain registered approximately a six out of ten; and without it was a nine.  (Reyes Tr. [23-cv-3315, dkt. no. 142-2] *56:17-57:18; 90:14-19.)  When not properly medicated, Reyes' condition caused him unpredictable, incapacitating pain comparable to broken bones or burns, frequently requiring hospitalization.  (Reyes Tr. 111:2-20, 118:13-17).)  Dr. Silver, his treating physician, did not characterize his opioid dependence as abuse.  (Silver Tr. [23-cv-3315, dkt. no. 159-2] *94:24-95:7, 107:22-108:2; Reyes SUF at ¶ 11 (PDF pg. 3).)

Beginning in 2015, Mr. Reyes was maintained on 60mg of morphine twice daily at Green Haven, which largely remained in place until the MWAP Policy took effect in 2017.  (Reyes Tr. 69:19-70:3; SUF ¶¶ 9-10 (PDF 14-15).)  After DOCCS adopted the MWAP Policy in June 2017, Mr. Reyes understood that his MWAP requests would go to Dr. Hammer.  (SUF ¶¶ 3-5, 9 [PDF pgs. 3, 13-14].)

On June 7, 2017, Dr. Silver submitted an MWAP Request seeking to continue Mr. Reyes on his established 60mg dose.  (Reyes SUF ¶ 11.)  Dr. Hammer responded that his "general rule in prescribing any opiate medication is to make it PRN," meaning that the medication be given only as needed.  (Agnew Decl. Ex. 59 [23-cv-3315 dkt. no. 163-3] at *69-70; Silver Tr. 147:23-150:12.)  On

resubmission, Dr. Hammer approved the request but directed a plan to reduce the dose over time.  (Agnew Decl. Ex. 59 at *72-73.)

On the next renewal, Dr. Hammer approved the prescription but characterized Mr. Reyes as "clearly addicted" and suggested his Toradol allergy might be fabricated to limit treatment options. (Agnew Decl. Ex. 59 [23-cv-3315, dkt. no. 163-4] at *100-102; SUF ¶ 15.)

On August 25, 2017, Dr. Silver emailed RMD Dinello—who was covering for Dr. Hammer—requesting that he "reconsider" his "decision to discontinue MSSR [morphine] for Mr. Reyes" explaining that, to his knowledge, Mr. Reyes had never misused his medications and that the 60mg dose had effectively controlled his pain and reduced hospitalizations.  (Agnew Decl. Ex. 59 at 122-123.)

Dr. Dinello replied to Dr. Silver, copying Dr. Hammer, stating that Reyes had a years-long history of "Physician-induced" substance abuse and addiction that had "severely negatively impacted his life."  (Agnew Decl. Ex. 59 at *122.)  Dr. Dinello noted Reyes' 1997 and 2015 criminal convictions for controlled substance sales as reasons why "continuing the use of any MWAPs is contraindicated." (Id.)  Dr. Dinello characterized Reyes' chronic pain from sickle cell disease as "Non-life or Limb Threatening" and recommended restricting opiates to "Acute Documented Sickle Cell Crisis" only, stating Mr. Reyes would have "much greater relief" if he stopped receiving opiates for chronic pain.  (Id.)

30

In September 2017, After Mr. Reyes returned from nearly two weeks of hospitalization, Dr. Silver asked Dr. Hammer to restore the 60mg dose.  (Agnew Decl. Ex. 59 at *146.)  Dr. Silver noted that Mr. Reyes had been taking MSSR 60 mg twice daily for years until a recent submission to Dr. Dinello ended up with him on a tapering dose of MSSR.  (Id.)  Dr. Silver also noted that Reyes "indicated" to Dr. Silver that Dr. Hammer had "spoken with his doctors at PHC" about the issue. (Id.)

Dr. Hammer declined, deferring to Dr. Dinello's addiction characterization and directing the taper to continue, stating:

> There are several things I think you should know about this case. I did not have any discussion with doctors at PHC contrary to what Mr. Reyes said so this obviously challenges his honesty. I did discuss the case with Dr. Dinello after he copied me with his MWAP response to taper off the morphine. It appears he knows this patient very well from a prior facility and that they had a prior rapport. There is also a history of substance abuse in the background. Dr. Dinello explained his logic to me and I was inclined to accept it. Patients with addiction to opiates can be very persuasive and convincing. It is often very difficult for a clinician to differentiate the patients complaints especially when underlying medical issues coexist. So, not wanting to be long winded, I would favor staying the course and continuing the opiate taper while presenting a united front. Let me know your thoughts after consideration.

(Id.)

On November 7, 2017, Dr. Silver emailed Dr. Hammer stating that Reyes was recently at Montefiore Hospital "for treatment of sickle cell crisis" and that Reyes had informed Dr. Silver that Dr. Hammer was "contacted by one of his treating physicians while

31

at [Montefiore] regarding his continuing MSSR 60 mg bid." (Agnew Decl. 59 at *173.) Dr. Silver again asked Dr. Hammer about resubmitting an MWAP request. (Id.)

Dr. Hammer responded, stating:

"Dr. Dinello apparently has a long standing prior knowledge of this patient. I fully agree with the decision to wean him off the morphine. The use of narcotics should logically be reserved to treat an actual SS crisis. As I'm sure you suspect, no one from the hospital contacted me regarding continuing his morphine. The fact that he continues to resort to trickery lends further support to his addictive tendencies. I would stay the course, offer encouragement and support."

(Id.)

Around the same time, Mr. Reyes, in turn, described pleading from the floor of his cell in pain as officers passed by for a long periods of time. (Reyes Tr. *95:22-96:3.) Mr. Reyes suffered seven hospitalizations in 2017. (Agnew Decl. Ex. 59 at *9-18, 26-28, 36-48, 74-90, 121-143, 156-169, 181-190.)

In January 2018, Dr. Hammer again declined to restore the 60mg dose and questioned whether Mr. Reyes' hospitalizations were related to his morphine level. (Agnew Decl. Ex. 60 [23-cv-3315, dkt. no. 163-5] at *4; Reyes SUF ¶¶ 24-25.) Mr. Reyes suffered eight hospitalizations that year. (Reyes SUF ¶ 32.)

When Dr. Silver submitted a new MWAP in May 2018, Dr. Hammer consulted Dr. Asif, who confirmed that 60mg twice daily was a reasonable and appropriate dose for a sickle cell patient. (Agnew Decl. Ex. 60 [23-cv-3315, dkt. nos. 163-5, 163-6] at *83-84; Reyes

32

SUF ¶¶ 26-27.)    Rather than conveying this to Dr. Silver, Dr. Hammer communicated the 60mg ceiling only to Dr. Bentivegna stating: "Dr. Asif suggested not to exceed 60 mg bid. If the patient seeks more, then it's time to consider abuse.  I would try to reach a rapport with the patient, but don't exceed 60 mg bid, and no in betweens."   (Agnew Decl. Ex. 60 at *83-84; SUF ¶ 28.) Dr. Bentivegna then responded to Dr. Hammer saying:

> Ha.  I am already considering abuse, but let's see what happens. I am not going to share this with Dr. Silver, or he will be on 60 mg right off the bat. Let's try 45 for now and see how it goes. Dr. Asif is a very nice and caring fellow, but sometimes I don't think he realizes the conditions we are working in. But, community standard and all that.

(Agnew Decl. Ex. 60 at *83.)

Thereafter, Dr. Hammer approved Dr. Silver's MWAP Request to prescribe morphine at a dose of 45 mg twice daily to Mr. Reyes without increases or decreases.  (Agnew Decl. Ex. 60 at *86-87.) Mr. Reyes did not ask Green Haven providers for an increase in the dosage, although he testified that he feared doing so would cause his medication to be revoked.  (Reyes Tr. 112:5-114:25; Reyes SUF ¶ 33.)

There is evidence that Defendant Hammer subsequently reviewed MWAP Request forms on November 2018, June 2019, September 2019, and March 2020, without correcting the misperception to Dr. Silver that 45 mg was the highest allowable dose.  (Agnew Decl. Ex. 60 [23-cv-3315, dkt. no. 163-6] at *151-153, 157-160; Ex. 61 [23-cv-

3315, dkt. nos. 163-8, 163-9] at *132-134, 201-203; Ex. 62 [23-cv-3315, dkt. no. 163-10]at 64-65.)

In October 2020, Dr. Silver completed an MWAP and Chronic Pain Patient Reassessment. (Agnew Decl. Ex. 62 [23-cv-3315, dkt. no. 163-11] at 116-117.) On November 6, 2020, Dr. Hammer approved a 60mg dose. (Agnew Decl. Ex. 62 at *119, 121-122; SUF ¶ 34.) Once his medications were restored, Mr. Reyes suffered only four crises in 2020 and three in 2021. (Agnew Decl. Ex. 62 [23-cv-3315, dkt. nos. 163-10, 163-11] at *23-61, 75-79, 87-93, 164-177; Agnew Decl. Ex. 63 [23-cv-3315, dkt. nos. 163-12, 163-13] at *4-28, 44-65, 103-113.) Mr. Reyes passed away in 2024. (Reyes SUF ¶ 1.)

In short, on one hand Dr. Silver repeatedly submitted MWAP requests to Dr. Hammer, Mr. Reyes was hospitalized seven or eight times a year when he received insufficient morphine, and Reyes testified that improper medication of his sickle cell condition caused him to lie in his cell floor in agony. On the other hand, Dr. Hammer characterized Mr. Reyes as a patient who resorts to "trickery" and who was not in an "actual SS crisis." Accordingly, there is an issue of fact. The Court concludes that a jury could find that the elements of a deliberate indifference claim have been met, that Dr. Hammer reflexively relied on the MWAP policies, and that Dr. Hammer was deliberately indifferent to Mr. Reyes' pain by failing to approve effective pain medication.

34

Furthermore, because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity. Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Moreover, the Court finds that "[b]ecause the complaint was filed within three years of the latest alleged act of Defendant in furtherance of the alleged policy of deliberate indifference . . . the continuing violation doctrine renders Plaintiff's claim timely." Mandalaywala, 2024 WL 3566990 at *8. Although a close call, a jury could reasonably conclude that during Dr. Silver's 2019 and 2020 MWAP requests, Dr. Hammer did not inform Dr. Silver that 60mg was actually the highest allowable dose of morphine, due to Dr. Hammer's deliberate indifference, and not due to a difference in medical opinion. See Brod, 653 F.3d at 164 (resolving ambiguities against the movant).

Accordingly, Dr. Hammer's motion for summary judgment (23-cv-3315, dkt. no. 134) as to Mr. Reyes' claim of deliberate indifference is DENIED.

35

### D. Plaintiff Crichlow's Claim: 23-cv-3386

In this matter, Defendants move for summary judgment.[4] (S.D.N.Y. 23-CV-3386, dkt. no. 131 [Mot.], 136 [MOL].) Plaintiff Kevin Crichlow opposes. (23-CV-3386, dkt. no. 166 [Opp.].) Defendants have replied. (23-CV-3386, dkt. no. 172 [Reply].)

Mr. Crichlow entered DOCCS' custody in 2008. He suffers from a number of chronic medical conditions including a long history of arthritis and degenerative changes in his right hand and avascular necrosis in the right wrist resulting from numerous surgeries. (Crichlow Tr. [23-cv-3386, dkt. no. 135-2] 18:2-8; 23:1- 26:15; 74:4-13; Agnew Decl. [23-cv-3386, dkt. no. 153-4] Ex. 23 at *27-28, 30; Agnew Decl. Ex. 24 at *11-12.) He also suffers from severe chronic pain caused by multilevel degenerative lumbar disc disease and tricompartmental osteoarthritis in his knee. (Crichlow Tr. 27:13-28:8; Agnew Decl. Ex. 25 [23-cv-3386, dkt. no. 153-12] at *97.)

Sometime in 2015, Mr. Crichlow started taking Gabapentin (Neurontin). In February of 2017, Mr. Crichlow saw a hand surgeon who recommended he continue Neurontin and pain meds as needed.

---

[4] In the notice of motion, Defendants move on behalf of David Rosner, Jayson Perez, and Brandi Lynn Corigliano, (dkt. no. 131). The memorandum of law, (dkt. no. 136), in support of the motion discusses conduct by NP Perez and Dr. Andola, and the opposition only discusses alleged misconduct by those two defendants, (dkt. no. 166). Accordingly, the Court will consider the motion to have been made on behalf of Defendants Perez and Andola.

(Agnew Decl. Ex. 24 at *10, 12.) NP Kristin Salotti prescribed him the Neurontin until June 1, 2017, when the MWAP Policy went into effect. (Agnew Decl. Ex. 5 [23-cv-3386, dkt. no. 152-5].) On July 6, 2017, NP Salotti submitted an MWAP Request Form to have the medication renewed, but it was denied by Dr. David Dinello. (Agnew Decl. Ex. 24 [23-cv-3386, dkt. no. 153-7] at *26-27.)

Over the next two years, Mr. Crichlow had numerous encounters with medical providers relating to hand and back issues during which time he complained of ongoing pain, (e.g., Agnew Decl. Ex. 25 [23-cv-3386, dkt. no. 153-10] at *14-15 (2018); Ex. 26 [23-cv-3386, dkt. no. 153-13] at *1 ("right hand not feeling good")), requested that his providers restore his Neurontin, (e.g., Agnew Decl., Ex. 25 at *73 ("needs meds" 8/29/18)), and "request[ed] stronger pain med[s]." (10/19/18) (Agnew Decl., Ex. 25 at *95.)

### 1.   NP Perez: Granted

Mr. Crichlow was transferred back to Five Points on March 8, 2019, and was under the care of NP Jayson Perez from then through July 2020. (Agnew Decl., Ex. 26 at *31-32.) NP Perez prescribed, inter alia, Carbamazepine, Ibuprofen, and Acetaminophen and noted that Mr. Crichlow had a "CT [] pending." (Id.)

On April 1, 2019, Mr. Crichlow complained of "pain [right] side of face, arm and leg chronic pain." (Agnew Decl., Ex. 26 at *42.) The note from NP Perez reads "will address [at] appt." (Id.) At Mr. Crichlow's examination on April 12, 2019, NP Perez noted

37

"[right] wrist: incomplete union" and "MRI spine: C4-C7 mod to severe stenosis." (Agnew Decl. Ex. 26 at *45.) The CT report confirmed the "ununited fracture," (Ex. 26 at *48), and he was approved for a right wrist splint on June 18, 2020, (Ex. 26 at *51).

On April 29, 2019, another provider noted that Mr. Crichlow "dropped a [sick call] slip, [complained of] pain in neck and back; requesting a new pill for pain." The provider also noted "Inmate refused am [sick call] call out." (Ex. 26 at *54.) A note on May 13, 2019, reflects refills of Mr. Crichlow's prescriptions. (Ex. 26 at *56.)

On May 13, 2019, NP Perez reviewed the results of the April 22 CT scan on Mr. Crichlow's wrist that revealed that after the "arthrodesis [fusion] of the right wrist [he was left] with incomplete union" and also had an "ununited fracture of the base of the fourth metacarpal." (Id. at *48; Crichlow SUF [23-cv-3386, dkt. no. 165] ¶¶ 14, 15.)

Mr. Crichlow refused to attend his orthopedic appointment on July 3, 2019, even though he was advised that without the appointment, it would not be possible to "determine what is wrong with your wrist and get a treatment plan." (Agnew Decl. Ex. 26 at *60.) Mr. Crichlow wrote, "I am unable to eat or physical and mental. Deny all my treatment at Five Points [] Also ADA meds for

38

Boost and Control A Diet." (Id.).[5]  But the May 20, 2019, entry reflects Mr. Crichlow's "asking for appt [with] provider [regarding] chronic [bilateral] hand pain." (Ex. 26 at *57.)  The appointment was denied, although apparently not by NP Perez. (Id.)

Again, on June 17, 2019, Mr. Crichlow complained of pain in his cervical spine. (Ex. 26 at *58.) NP Perez did not see him but noted that his MRI in 2018 showed foraminal stenosis, and he asked the nurse, "any symptoms?" even as Mr. Crichlow was reporting pain – a symptom. (Id.) Perez wrote "if not symptoms [treat] with NSAIDS" and did not see him. (Id. at *64; Crichlow SUF ¶ 20.)

Under NP Perez's care, Mr. Crichlow apparently had continuous pain medications, primarily Carbamazepine, Ibuprofen and Acetaminophen.  His health record does, however, reflect requests for stronger medications, e.g., April 29, 2019 (Agnew Decl., Ex. 26 at *54).  Although NP Perez could have been more responsive to Mr. Crichlow's complaints and seemingly ignored his pain symptoms on or about June 17, 2019. (Agnew Decl., Ex. 26 at 58), Mr. Crichlow did refuse at least one orthopedic appointment on July 3, 2019, (Agnew Decl., Ex. 26 at 60). While NP Perez's responses might well constitute negligence, the Court cannot find that they constituted

---

[5] As noted throughout Mr. Crichlow's medical record, he suffered from a long list of maladies, including HIV which apparently caused weight loss. Those other maladies do not seem to the basis of his complaints against NP Perez and Dr. Andola. (See generally, Pl. Memorandum in Opposition dkt. no. 166 at ECF *26-32.)

deliberate indifference. See Nunez v. Bentivegna, 2024 WL 3728978, at *5 (S.D.N.Y. Aug. 7, 2024) ("mere negligence is not enough to state a claim for deliberate indifference." (citation omitted)); Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)("mere medical malpractice does not constitute an Eighth Amendment violation" (citation omitted)).

Accordingly, NP Perez's motion for summary judgment in 23-cv-3386 is GRANTED.

### 2.    Dr. Andola: Granted

On December 4, 2020, DOCCS transferred Mr. Crichlow to Eastern New York Correctional Facility ("Eastern"). (Crichlow SUF ¶ 36.) His indraft noted, "Major medical complaint is chronic pain to L foot, right hand and wrist, back pain." (Agnew Decl. Ex. 27 [23-cv-3386, dkt. no. 153-17] at *112.)  Defendant Andola became his provider. (Crichlow SUF ¶ 37.) Dr. Andola first saw Mr. Crichlow on December 22, 2020.  (Crichlow SUF ¶ 39.)  Mr. Crichlow reported his issues, including bilateral hip pain, low back pain, and his wrist issues. (Crichlow SUF ¶¶ 40, 41, 45; Agnew Decl. Ex. 27 at *146, 153.) Dr. Andola wrote prescriptions for Ibuprofen and Carbamazepine (Tegretol) for pain. (Andola Decl. [23-cv-3386, dkt. no. 133] ¶ 16.) Dr. Andola also ordered X-rays on December 22 (Ex. 27 [23-cv-3386, dkt. no. 153-17] at *161) which showed degenerative lumbar disc disease, and spondylosis in Mr. Crichlow's back, (Crichlow SUF ¶ 49), and the surgical hardware in his right wrist

in a satisfactory position. (Andola Decl. [23-cv-3386, dkt. no. 133] ¶ 18.)

On December 28, 2020, January 4, 2021, and January 11, 2021, nurses recorded that Mr. Crichlow was suffering from lower back and hip pain, and taking Tylenol and Ibuprofen. (Agnew Decl., Ex. 27 at *155, 157, Ex. 28 [23-cv-3386, dkt. no. 154-1] at *3.)

On January 14, 2021, Dr. Andola issued a cane to Mr. Crichlow and noted that consultation for, inter alia, physical therapy was pending. (Andola Decl. ¶ 20). Mr. Crichlow's Physical Therapy notes consistently reported his pain. (Agnew Decl., Ex. 28 at *25 (3/2), 32 (3/15), 36, 37 (3/16), 38, 43 (request TENS unit), 47-50, 55.) As a result, Dr. Andola again saw him on March 15, 2021, when he asked for a back brace and to see a "spine surgeon." (Id. at 30) Dr. Andola gave him the brace but did not refer him to orthopedics or adjust his medications. (Id. at 30, 35.) Mr. Crichlow was issued a TENS unit after his physical therapist requested it "to manage pain," (id. at 47), on April 6, 2021.

It is of note that on February 8, 2021, DOCCS rescinded the MWAP Policy and promulgated Health Services Policy 1.24A due to the Allen I class action litigation. (Agnew Decl. Ex. 16 [23-cv-3386, dkt. no. 152-16] "1.24A Policy;" Ex. 20 [23-cv-3386, dkt. no, 152-20], "Declaration of Dr. Carol Moores," ¶¶ 13-18.)

Two days later, on April 29, 2021, Mr. Crichlow was seen by orthopedic hand specialist Dr. Richard McGill regarding his right

wrist and loose hardware. (Crichlow SUF ¶ 63.) After evaluating Mr. Crichlow, Dr. McGill recommended an EMG, that the hardware be removed, and a new splint provided. (Agnew Decl. Ex. 28 [23-cv-3386, dkt. no. 154-2] at *76; Crichlow SUF ¶ 69.)

The AHR notes that following Mr. Crichlow's consult with the orthopedic surgeon that Mr. Crichlow "states orthopedic recommends Neurontin – very difficult to read consult." (Agnew Decl., Ex. 28 at *75.) However, the orthopedic surgeon's typed version of this finding says: "Nonunion for nerve pain," clearly a reference to the nonunion of the bones in Mr. Crichlow's wrist. (Andola Decl.[23-cv-3386, dkt. no. 133] ¶ 23, Ex. A [23-cv-3386, dkt. no. 133-3] at *112.)

Accordingly, following Mr. Crichlow's consult with the orthopedic surgeon on May 4. 2021, Dr. Andola referred him for an EMG and orthopedic consults to approve removal of right wrist screw and an EPL repair. (Andola Decl. ¶ 24, Ex. B.)

Dr. Andola continues:

> 25. On May, 20, 2021, it was reported to me that while in the Special Housing Unit, Mr. Crichlow was manipulating the door piece that was in place to prevent him from throwing items at staff when he somehow injured his right hand/arm. I noted that his reported injury/contusion was not consistent with his reported symptoms in claiming "no feeling in right arm." I nevertheless ordered a new x-ray of his right wrist and forearm and noted he already had an EMG scheduled [Andola Decl., Ex. A] (p. 106).

26. On June 8, 2021 the FHS1 system reflects that the EMG appointment was cancelled due to patient refusal [Andola Decl.,] (Ex. B).

27. Mr. Crichlow transferred out of Eastern on or about June 22, 2021. [Andola Decl., Ex A] (p. 131)

Dr. Andola also seemed to be responsive to Mr. Crichlow's complaints. She continued his medications upon his arrival at Eastern and sent him for X-rays and consults. The notes reflect that when Dr. Andola saw Mr. Crichlow on March 15, 2021, in response to complaints of pain, he asked for a back brace and to see a "spine surgeon." (Agnew Decl. Ex. 28 at *30.) While Dr. Andola did approve the back brace, she did not refer him to orthopedics or adjust his medications. (Id. at *30-35.) She did, however, issue a TENS unit on April 6, 2021, as requested by his physical therapist "to manage pain." (Id. at *47.)

As with NP Perez, Dr. Andola was attentive to Mr. Crichlow and certainly did not demonstrate any deliberate indifference to his complaints. At most, the medical record discloses a disagreement about whether Mr. Crichlow's complaints on March 15, 2021, required another orthopedic appointment or adjustment to his medications as opposed to issuance of the TENS unit. Such disagreements do not constitute deliberate indifference. See Nunez, 2024 WL 3728978, at *5; Hathaway, 99 F.3d at 553.

Accordingly, Dr. Andola's motion for summary judgment in 23-cv-3386 is GRANTED.

### E. Plaintiff Dunbar's Claim: 23-cv-3391[6]

In this matter, NP Mary Ashong and NP Brandi Corigliano move for summary judgment. (S.D.N.Y. 23-cv-3391, dkt. no. 116 [Mot.]). Plaintiff Wilbert Dunbar opposes the motion. (23-cv-3391, dkt. no. 136.) Defendants have replied. (23-cv-3391, dkt. no. 138.)

As an initial matter, while Defendnats move for the Court to strike portions of Plaintiff's Rule 56.1 counterstatement the Court declines to do so. See Primmer, 667 F. Supp. 2d at 254.

Plaintiff suffers from severe nerve pain, seizures, and significant right-hand contractures as a result of, at least in part, being shot in the head when he was twenty years old. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Summary Judgement, dated August 1, 2025 ("Pl. Opp'n") [dkt. no. 136] at 28; Manley Decl., Ex. B, Transcript of Deposition of Wilbert Dunbar ("Dunbar Tr.") [dkt. no. 119-2] at 14:7-23.) Plaintiff has a history of drug abuse but has been sober since 2012. (Dunbar Tr. at 21:15-23:3.) Plaintiff was drafted into Green Haven Correctional Facility ("Green Haven") in April 2019 (Defendant Dr. John Hammer's [State-Represented Defendant's] Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1, dated May 21, 2021 ("SSUF") [dkt. no. 114] ¶ 4) and his intake documentation represents that he was taking Phenobarbital,

---

[6] All docket number mentioned in this section refer to 23-CV-3391.

Depakote, and Gabapentin (Neurontin) daily (Agnew Decl., Ex. 53 [dkt. no. 137-70] at 8, 13).   Plaintiff took these medications to control his seizures, and the Neurontin was effective in treating his nerve pain.   (Dunbar Tr. at 14:7-18, 18:14-22.)

### 1.   NP Ashong: Denied

Defendant Ashong argues that no reasonable jury could conclude that she was deliberately indifferent because she provided care that was "adequate and reasonable" and based upon her "sound medical judgment."  (Manley Decl. at 16.)  Shortly after Plaintiff arrived at Green Haven, Ashong submitted MWAP requests for Flexeril, Neurontin, and Phenobarbital.  ([Non-State Represented] Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated May 23, 2025 ("NSSUF") ¶ 6 [dkt. no. 106].)  Dr. Hammer approved her request for a 60-day supply of Neurontin and Phenobarbital, but denied the request for Flexeril.  (Declaration of Mary Ashong, dated May 20, 2025 ("Ashong Decl."), Ex. B [dkt. no. 117-3] at 4, 7, 10.)  On May 15, 2019, Ashong tapered Plaintiff off of his Neurontin because Dr. Hammer had approved a supply of only 60 days.  (Ashong Decl. ¶ 19.)  She did not submit another MWAP request for Neurontin because in her view Plaintiff had "no demonstrable need for Neurontin" as he was on another anti-seizure medication and "Neurontin is not medically indicated to treat osteoarthritis."  (Id.)

Ashong may be mistaken in her belief that the Neurontin was only used to treat Plaintiff's osteoarthritis. Plaintiff's medical records indicate that he has "neuropathy to bilateral upper extremities," which Ashong attempted to verify with an EMG that could not be completed due to Plaintiff's untreated pain. (Ashong Decl., Ex. A Part I [dkt. no. 117-1] at 39-41; Dunbar Tr. 88:4-13.). Plaintiff also repeatedly requested Neurontin and Depakote, which Ashong acknowledged and declined in a January 15, 2020 note stating that "Depakote and Neurontin will not be renewed. This has been discussed with [inmate] multiple times. This decision will not be changed." (Agnew Decl., Ex. 54-1 [dkt. no. 137-74] at 3.) Neurontin is considered a first-line treatment for neuropathic pain, while the other medications that Plaintiff was on are not treatments for neuropathic pain. (Agnew Decl., Ex. 15, Transcript of Deposition of Dr. Steven Weinstein ("Dr. Weinstein Tr.") [dkt. no. 137-15] at 91:2-6, 101:3-8; Agnew Decl., Ex. 3, Transcript of Deposition of Dr. Gerald Cahill ("Dr. Cahill Tr.") [dkt. no. 137-3] at 90:11-16; see also Agnew Decl., Ex. 4 [dkt. no. 137-4] at 9 (peer reviewed paper listing Neurontin as an effective treatment for neuropathic pain).) Despite the evidence that Neurontin may have alleviated the pain that Plaintiff described as "burning head to toe[,]" (Agnew Decl., Ex. 54-4 [dkt. no. 137-77] at 9) Ashong declined to file another MWAP request in the two subsequent MWAP Reassessment forms without any apparent justification (id. at 4-9

46

(Ashong only comments that Neurontin was "discontinued on indraft" at 7)).   Therefore, a jury could find that the decision not to treat Plaintiff's neuropathic pain was due to reflexively relying on the MWAP policy as opposed to being based in sound medical judgment.

In addition, the Court finds that because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity.   Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, NP Ashong's motion for summary judgment in 23-cv-3391 is DENIED.

### 2.   NP Corigliano: Denied

On June 18, 2021, Plaintiff was transferred to Marcy Correctional Facility ("Marcy").   (SUF ¶ 101.)   Plaintiff had his first appointment with Defendant NP Corigliano on June 23, 2021, and requested to be restarted on Phenobarbital and Neurontin.   (SUF ¶¶ 108, 113.)   Corigliano noted that one of the reasons for the consultation was Plaintiff's "neu[r]opathy."   (Agnew Decl., Ex. 55-2 [dkt. no. 137-79] at 5.)   She also noted that Plaintiff "wants Neurontin for pain," but that first he would "need to try Cymbalta."   (Id. at 3.)   Plaintiff returned July 1 complaining of increased pain in his lower back radiating down his right leg. (Id. at 15, 20.)   On July 16, Plaintiff asked Corigliano again to

47

restart Phenobarbital and Neurontin, which she summarily denied writing in her progress notes that she "will not restart meds at this time" because Plaintiff had not had a seizure in five years. (Id. at 17.)

Plaintiff continued to complain of significant pain, noting that on July 29, his worst pain was an eight out of ten.  (Id. at 25.)  His medical record notes that he was "[r]equesting something different for pain[,]" on August 16.  (Id. at 34.)  Plaintiff did not see Corigliano again until November 18 when he complained of "full body pain" that was so debilitating that he requested a wheelchair.  (Agnew Decl., Ex. 55-3 [dkt. no. 137-80] at 16.)  In response, Corigliano restarted him on Elavil, which was previously documented as ineffective for his pain.  (See id.; see, e.g., Agnew Decl., Ex. 54-1 at 23-26, Ex. 54-2 [dkt. no. 137-75] at 4-5, 9, 11; Ex. 54-3 [dkt. no. 137-76]] at 6, 8; Ex. 54-4 at 3, 11.) Plaintiff returned to Corigliano on December 13 to report that Elavil and Cymbalta had been ineffective in abating his pain. (Agnew Decl., Ex. 55-3 at 34.)  On February 24, 2022, Corigliano restarted Plaintiff on Neurontin to treat his pain.  (Agnew Decl., Ex. 56-1 [dkt. no. 137-81] at ECF 13.)  She then titrated the dosage until Plaintiff's pain was a "two or three" out of ten. (Dunbar Tr. at 201:20-202:5.)  There is evidence that Corigliano delayed  Plaintiff's  medication  for  eight  months  despite Plaintiff's  repeated  requests  for  Neurontin,  a  first  line

treatment for neuropathic pain.  A jury could find that this decision, which left Plaintiff in considerable pain, was due to Corigliano's reflexively relying on the MWAP policy rather than sound medical judgment.

Moreover, the Court finds that because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity.  Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, NP Corigliano's motion for summary judgment in 23-cv-3391 is DENIED.

## F. Plaintiff Hale's Claim: 23-cv-3396

In this matter, Defendant Dr. Doreen Smith moves for summary judgment.  (Notice of Motion, dated June 20, 2025, ("Smith Mot.") [23-CV-3396, dkt. no. 93]; Defendant's Reply Memorandum of Law in Support of Their Motion for Summary Judgment, dated June 20, 2025, ("Smith MOL") [23-CV-3396, dkt. no. 97].)  Plaintiff Bryan Hale opposes the motion.  (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, dated October 8, 2025 ("Hale Opp.") [23-CV-3396, dkt. no. 120].)  Defendant Smith has replied.  (Non-State Represented Defendant's Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated December 5, 2025 ("Smith Reply") [23-cv-3396, dkt. no. 125].)

49

As an initial matter, while Defendant moves for the Court to strike portions of Plaintiff's Rule 56.1 counterstatement, the Court declines to do so. See Primmer, 667 F. Supp. 2d at 254-55.

Plaintiff suffered from chronic lower back pain and neuropathy for many years prior to entering DOCCS custody in 2020, stemming from a 2009 work injury where he broke his back. (Declaration of Amy Jane Agnew, Esq., in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, dated October 8, 2025 ("Agnew Decl."), Ex. 36 [23-CV-3396, dkt. no. 109-12] at *55, 63; Declaration of Ryan E. Manley in Support of Motion for Summary Judgment, dated June 20, 2025, Ex. B ("Hale Tr.") [23-CV-3396, dkt. no. 96-2] at 42:5-23.) Plaintiff had two subsequent back surgeries in 2016 and December 2019, the second shortly before he entered DOCCS custody in early 2020. (Hale Tr. at 23:18-21; 49:13-50:16; 64:5-9.) Plaintiff entered Greene Correctional Facility ("Greene") on or around March 4, 2020. (Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated June 20, 2025, ("DSUF") [23-CV-3396, dkt. no. 94] ¶ 2.)

The parties disagree about what medications Plaintiff was receiving prior to his arrival at Greene. Plaintiff's medical records reflect that from February 26, 2020 to March 3, 2020, he was he was receiving 300mg of Neurontin twice a day, Tylenol with codeine (an opioid) twice a day, and 10mg of Flexeril three times a day. (Agnew Decl., Ex. 40 [23-CV-3396, dkt. no. 109-16] at *1-

50

3, 5-9.)    Plaintiff claims he was prescribed OxyContin and Gabapentin (i.e., Neurontin) when he was at his prior DOCCS facility.    (Hale Tr. at 64:12-66:22.)    On the other hand, Plaintiff's current medications as per the nursing assessment intake form did not include a prescription for Neurontin, Codeine, or OxyContin, but did include 10 mg Flexeril prescription which was marked with an X. (DSUF ¶ 5; Agnew Decl., Ex. 36 at *34.)    The nursing assessment form included Plaintiff's chronic medical problems, like his "lower back pain[,]" his "recent back fusion[,]" and "neuropathy[.]"   (Agnew Decl., Ex. 36 at *34.)    Dr. Smith signed off on this form on March 5, 2020.    (Id.)

Defendant Dr. Smith first saw Plaintiff for treatment on March 5, 2020.    (DSUF ¶ 3; Declaration of Doreen Smith, M.D., dated June 19, 2025, ("Smith Decl.") [23-CV-3396, dkt. no. 95] ¶ 15.)    Dr. Smith's notes from the first meeting note "chronic pain" several times and mention his previous Neurontin prescription.    (DSUF ¶ 8; Smith Decl., Ex. A at *6-7.)    Plaintiff recounts that at his first meeting he was made aware by Dr. Smith that he would no longer receive the medications he received downstate.    (Hale Tr. 196:18-199:16.)    Plaintiff said, "[Dr. Smith] opened the file, she said the stuff you get at Downstate you will not get here. And I asked why are you sending me here to this place, this is not a medical jail? And she says there's no stairs."   (Hale Tr. at 199: 20-24).

Dr. Smith prescribed a Cymbalta trial dose of 20 mg to treat Plaintiff's chronic pain. (DSUF ¶ 9.) Dr. Smith did not continue Plaintiff's Flexeril prescription "because it is a muscle relaxer that is typically prescribed in acute instances which Mr. Hale did not present on that date." (Smith Decl. ¶ 17.) On March 16, 2020, just ten days later, Plaintiff expressed continuing back pain and asked for a prescription. (Agnew Decl., Ex. 36 at *71.) On April 23, 2020, Plaintiff expressed that he "need[ed] to talk about changing medication" and that his "feet are numb[.]" (Id.) On April 27, 2020, Dr. Smith spoke with Plaintiff and noted he was suffering from back pain, numb feet, nerve damage, chronic pain, and neuropathy. (Id. at *72.) She increased Plaintiff's Cymbalta dosage from 20mg to 60 mg per day "due to ongoing complaints of back pain and numbness in the feet[.]" (DSUF ¶ 12; Smith Decl. ¶ 18.)

Plaintiff reports telling Dr. Smith that he had previously taken Cymbalta but it gave him suicidal tendencies and made him "crazy[.]" (Hale Tr. at 97:10-18; 98: 7-14.) Plaintiff reports having similarly uncomfortable side effects from Cymbalta during the period he took it at Greene, like "feel[ing] weird" and "stupid." (Id. at 160: 8-20.) On November 7, 2020, Plaintiff filled out a medical treatment refusal form and stated his reason for refusing Cymbalta as "Need to See Doctor Try New Meds Need Physical Therapy For Back Surgery[.]" (Agnew Decl., Ex. 36 at

52

*81¬82.)   Plaintiff was prescribed Cymbalta until mid-November 2020 when a provider discontinued the medication.   (DSUF ¶ 13.) No alternative pain medication was prescribed for Plaintiff at this time.   (Agnew Decl., Ex. 36 at *68, 82.)

On February 4, 2021, Plaintiff told a member of the Greene medical staff, "I need to see a doctor about my severe back pain – I am hoping to get new medication for pain . . . the nerve damage to my feet feels like its getting worse."   (Agnew Decl., Ex. 37 [23-CV-3396, dkt. no. 109-13] at *5.)   In response, a medical provider restarted the Plaintiff's Flexeril prescription on that same day.   (Id.)

On February 8, 2021, the MWAP Policy was rescinded and replaced with policy 1.24A "Prescribing for Chronic Pain" which says in part: "Pain management medication should only be discontinued after a provider has met with the patient, discussed the issues regarding the use of the medication, analyzed the patient's situation, and subsequently determined that it is in the best interest of the patient for the medication to be discontinued."   (Agnew Decl., Ex. 16 [dkt. no. 107-16] at 2.)

Dr. Smith discontinued the Flexeril prescription on February 26, 2021.   (Agnew Decl., Ex. 37 at *5.)   Dr. Smith maintains that this is because "Flexeril is typically prescribed for short term use (two to three weeks) to manage muscle spasms associated with acute musculoskeletal conditions" and "[l]ong term use of Flexeril

53

can lead to physical dependency and the need for higher doses and potential liver and cardiovascular issues[.]" (Smith Decl. ¶ 19.) There is no indication that at this time Dr. Smith prescribed any alternative pain medication or muscle relaxer or met with the Plaintiff to discuss the discontinuance. (Agnew Decl., Ex. 37 at *5.)

On March 1, 2021, Mr. Hale spoke to a medical provider and said that he had "questions about why Flexeril was [discontinued.]" (Id. at *8.) Similarly, on March 5, he represented to a medical provider, "I want my Flexeril restarted." (Id.) Three days later, Plaintiff met with Dr. Smith about his chronic pain and she prescribed Elavil and referred him for a pain management consult. (DSUF ¶¶ 20-21; Agnew Decl., Ex. 41 [23-CV-3396, dkt. no. 109-17] at *8-10.) Plaintiff said that Elavil was helpful for his sleeping but not for his muscle spasms and did not treat his symptoms in the same way Flexeril did. (Hale Tr. at 95:19-96:16.)

On April 27, 2021, Dr. Sarah Narayan, a pain specialist, conducted a consultation of Plaintiff and recommended: a) an increased Elavil (generic name: amitriptyline) prescription from 25 mg. to 50 mg. daily; b) a muscle relaxer Tizanidine, at a starting dose of 2 mg., twice per day; c) a course of physical therapy for lumbar stabilization; and d) strengthening of both quadricep muscles for right knee pain. (Agnew Decl., Ex. 37 at *11, 21-22.) Dr. Smith subsequently submitted a Non-Formulary

request for Tizanidine which was approved on May 3, 2021.  (DSUF ¶ 22; Agnew Decl., Ex. 41 at *23.)

On May 5, 2021, Plaintiff suffered a cardiac medical incident and was transferred to Albany Medical Center.  (Agnew Decl. Ex. 37 at *24, 38, 51-52, 55, 72-73, 76, 105.)  There, he received Ultram, an opiate, and Lidocaine patches for his chronic pain and medical records reported "[Plaintiff] did feel better with pain control." (Id. at *73-74, 105.)  On May 18, 2021, Plaintiff returned to Greene.  (Id. at *55.)

Throughout Plaintiff's remaining seven months at Greene, he continued to report his chronic pain to medical providers.  On June 7, 2021, a physical therapist noted that Mr. Hale reported "persistent pain in lower back and constant numbness in [bilateral feet and toes]."  (Id. at *141.)  On June 11, 2021, a physical therapist noted Mr. Hale's chronic and right knee pain and recommended two weeks of physical therapy for quads and an x-ray for his right knee.  (Id. at *144.)  On June 16, 2021, Dr. Smith noted Plaintiff's "chronic [right] knee pain" but made no changes to his pain medications.  (Id. at *146.)  On July 26, 2021, at his physical therapy, Plaintiff said, "this pain is not going away[.]" (Id. at *160.)  On August 9, 2021, at one of his final physical therapy appointments, Plaintiff said his right knee "hurts all the time[.]"  (Id. at *174.)  On August 31, 2021, Dr. Smith noted the Plaintiff "feels OK" but also marked the Plaintiff "[positive for]

55

chronic pain[.]"   (Id. at *181.)   During this period, Plaintiff was prescribed 2mg of Tizanidine, a muscle relaxer, twice a day and 50mg of Elavil in the evenings.   (Agnew Decl., Ex. 37 at *30-34.)   This prescription is consistent with the recommendation of the pain management specialist.   (Agnew Decl., Ex. 41 at *21.)

Plaintiff maintains that every time he spoke to Dr. Smith he told her the medication he was receiving was "not working" and she told him "you are not getting any of them" but failed to provide a reason as to why.   (Hale Tr. at 157:22-158:18.)   Plaintiff reports during his time at Greene, he would tell Dr. Greene "my back is hurting or the pain is getting bad[,]" but ultimately "she would get mad and throw me out."   (Id. at 90:19-92:12.)

### 1.    Dr. Smith: Denied

There is no dispute the Plaintiff suffered from serious medical conditions that caused chronic pain.   As evidenced by his medical records, when Mr. Hale entered Greene, his medical history reflected his chronic medical problems, like his "lower back pain[,]" his "recent back fusion[,]" and "neuropathy[.]"   (DSUF ¶ 8; Agnew Decl., Ex. 36 at *63-64.) These medical issues stem from his back injury and subsequent surgeries. (Agnew Decl., Ex. 36 at *55, 63; Hale Tr. at 23:18-21, 42:5-23, 49:13-50:16, 64:5-9.)

Thus, the pertinent question is whether the Defendant's care, specifically Defendant's prescription of certain medications upon

56

entry to Greene (DSUF ¶ 5; Agnew Decl., Ex. 40 at *1-3, 5-9; Hale Tr. 64:12-66:22), the discontinuances of the Flexeril prescription (Agnew Decl., Ex. 37 at *5; Smith Decl. ¶ 19), and denial of other medications (Neurontin and opioids) (Hale Tr. at 196:18-199:24), created a particular risk of harm to the Plaintiff.

Prior to entering Greene, Mr. Hale was successfully treated with Neurontin and Flexeril.  (DSUF ¶ 8; Agnew Decl., Ex. 40 at *1-3, 5-9.)  Plaintiff was not treated with Neurontin and, for the most part, was not treated with Flexeril during his time at Greene. (Agnew Decl., Ex. 40.)  There is a disagreement between parties about what medications the Plaintiff was on prior to entering Greene.  (DSUF ¶ 5; Agnew Decl., Ex. 40 at *1-3, 5-9; Hale Tr. at 64:12-66:22.)  Upon arriving to Greene, Mr. Hale claims Dr. Smith said "the stuff you get at Downstate you will not get here."  (Hale Tr. at 199:20-24.)  After Cymbalta was discontinued in November because, according to Mr. Hale, he had serious issues with side effects, Dr. Smith failed to provide any alternative pain medication for Mr. Hale (Agnew Decl., Ex. 37 at *5), despite knowing about his chronic back pain, neuropathy, knee pain, and recent surgery (DSUF ¶ 8).  Mr. Hale had no access to pain medication for at least two months, and it was only under another provider that he prescribed Flexeril to offer relief for his "severe back pain."  (Agnew Decl. Ex. 37 at *5.)  Shortly after, Dr. Smith discontinued the Flexeril prescription, in a manner

57

contrary to the new DOCCS pain management Policy 1.24A, and again without providing an alternative medication or plan for Mr. Hale's pain management.  (Id.; Agnew Decl., Ex. 16 at 2.)  When Mr. Hale was hospitalized in March 2021, he finally received pain management and felt better, (Agnew Decl., Ex. 37 at *73-74, 105) but, for the most part, this regime was not continued upon his return to Greene. Throughout his time at Greene, Mr. Hale represented to medical staff that he was in pain.  (Agnew Decl., Ex. 36 at *71, 72; Agnew Decl., Ex. 37 at *141, 144, 146, 160, 174, 181.)

Though Dr. Smith did make changes in Mr. Hale's pain medication, including increasing Cymbalta (DSUF ¶ 12; Smith Decl. ¶ 18), prescribing Elavil (DSUF ¶ 20; Agnew Decl., Ex. 40 at *30-34), the consultation with the pain specialist and following her recommendations (DSUF ¶ 21; Agnew Decl., Ex. 37 at *8-10, 21, 23; Agnew Decl., Ex. 40 at *30-34), there still exists a question of fact as to whether Defendant was deliberately indifferent to Plaintiff's medical needs, based on the months he went with no pain medication, Mr. Hale's testimony about Dr. Smith's refusal to give the medications he received Downstate that had previously been effective, the discontinuance of Flexeril contrary to the new 1.24A Policy, and other pertinent facts in the medical records and testimony.  Based on the facts in the record, a reasonable juror could find that Dr. Smith was deliberately indifferent to Mr. Hale's medical needs.

58

Moreover, the Court finds that because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity.  Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, Dr. Smith's motion for summary judgment in 23-cv-3396 is DENIED.

## G. Plaintiff Locenitt's Claim: 23-cv-3399

In this matter, NP Brandi Corigliano and NP Mandi Zaccagnino move for summary judgment.  (S.D.N.Y. 23-cv-3399, dkt. nos. 176 [Mot.], 181 [MOL].)  Plaintiff Kiaza Locenitt opposes the motion. (23-cv-3399, dkt. no. 207 [Opp.].)  Defendants have replied.  (23-cv-3399, dkt. no. 212 [Reply].)

As an initial matter, while Defendants move for the Court to strike portions of Plaintiff's Rule 56.1 counterstatement, the Court declines to do so.  See Primmer, 667 F. Supp. 2d at 254.

### 1.    NP Corigliano: Denied

Mr. Locenitt suffers from chronic pain in his hip, left knee, right leg, abdomen, and lower back stemming from multiple gunshot wounds and being struck by a vehicle, as well as degenerative joint disease, and chronic migraines.  (Locenitt SUF [23-cv-3399, dkt. no. 206] ¶¶ 3, 5, 53, 81, 84.)  Beginning in January 2015, Neurontin (Gabapentin) was prescribed to manage his chronic pain, and by October 2015 his dosage was increased to 800mg BID.  (Agnew Decl.

59

Ex. 69 [23-cv-3399, dkt. nos. 200-3, 200-4] at *1, 2, 4, 10, 162, 168.)  Mr. Locenitt described Gabapentin as reducing his pain to "zero to no pain," while without it his pain reached a 10 out of 10.  (Lucent Tr. [23-cv-3399, dkt. no. 180-2] *46:15-24; 64:20-65:7.)

In April 2017, Dr. Vertino, a neurologist, ordered an EMG and noted that Locenitt had "mild chronic denervation."  (Agnew Decl. Ex. 71 [23-cv-3390, dkt. no. 200-8] at *54-57.)

On May 26, 2019, a nurse reported that Locenitt: "took meds (Neurontin) in his hand and put one pill on the floor—his Neurontin.  When questioned why he did that and if [he is] not going to take it to give it back, [he] then picked it [illegible] up off the floor the Neurontin and then took it."  (Agnew Decl. Ex. 71 at 82.)

In February 2020, Locenitt arrived at Marcy RMHU, at which time his medications included HCTZ, Amlodipine, Lipitor, Ibuprofen, Albuteral, Advair, Clindamycin Gel, and Chlorhexidne. (Locenitt SUF ¶¶ 1, 4.)  There, NP Corigliano was his assigned provider, and she entered a cardiology referral and allowed a nitroglycerin prescription. (Locenitt SUF ¶¶ 1-2, 8, 11; Agnew Decl. Ex. 74 [23-cv-3399, dkt. no. 200-12] at *73.)

Beginning on February 24, 2020, Mr. Locenitt repeatedly requested Neurontin and complained of worsening back, hip, and knee pain. (Agnew Decl. Ex. 74 at *74, 75, 78, 79, 95, 96.)

On April 3, 2020, Locenitt asked for Neurontin by name or "something" "anything stronger" and the nurse told him it was "not formulary."  (Id. at *96.)

On April 8, 2020, without examining Mr. Locenitt, Corigliano prescribed him Naproxen, a medication to which he is allergic. (Agnew Decl. Ex. 74 at *97; Locenitt Tr. 129:24-131:14.) On April 9, 2020, a nurse emailed NP Corigliano alerting her of Locenitt's prior use of Gabapentin.  (Agnew Decl. Ex. 74 at *98.)  Corigliano then prescribed Meloxicam.  (Id. at *99.)  On April 28, 2020, a nurse informed Mr. Locenitt that "Neurontin is no longer being Rx'd [due to] abuse potential so Inmate should attempt to find something else that works and to stop asking for medications that are not being allowed any longer."  (Id. at *108.)

Mr. Locenitt continued to complain of inadequate pain control throughout the spring and summer of 2020.  (Id. at *136, 137.)

On June 4, 2020, NP Corigliano referred to Mr. Locenitt as a "pain in the A." (Id. at *123.)  On July 13, 2020, another nurse described Locenitt to Corigliano as a "grown" man throwing a "childhood tantrum," in need of a "spanking," "A lot of spankings," and "our chronic complainer, from wanting more pain meds (specifically Neurontin) to ice for his 'chest pain,'" to which NP Corigliano responded with a picture of a cartoon woman and said, "Honestly! Thanks."  (Id. at at *139.)

61

On July 30, 2020, that same nurse emailed NP Corigliano that Locenitt "writes to sick call a lot asking for a new med or increased dose." (Id. [23-cv-3399, dkt. no. 200-13] at *146.)

Based on these facts, the Court concludes that a jury could find that the elements of a deliberate indifference claim have been met and that NP Corigliano was deliberately indifferent to Mr. Locenitt's pain by failing to approve effective pain medication.  This is especially true given Corigliano's labeling of Locenitt as a "pain in the A" and Corigliano's response of "Honestly! Thanks" to an email characterizing Locenitt as a "chronic complainer," in need of a spanking after he requested Neurontin.

Moreover, because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity.  Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, NP Locenitt's motion for summary judgment in 23-cv-3399 is DENIED.

### 2.   NP Zaccagnino: Granted

Mr. Locenitt was transferred to Green Haven Correctional Facility on April 8, 2021, where NP Zaccagnino became his provider. (Locenitt SUF ¶¶ 80, 81.)  Throughout Locenitt's time at Green Haven, NP Zaccagnino regularly evaluated, monitored, and treated his medical conditions, beginning with her management of his

abscesses, asthma, and diagnostic referrals between May and July 2021 (Locenitt SUF ¶ 97.)  When informed in early August that Ibuprofen was no longer relieving his joint pain, (Locenitt SUF ¶ 98), she recalled his earlier report that Celebrex had been ineffective and that he wished to try Ibuprofen (SUF ¶ 99), and she adjusted his regimen by prescribing Naproxen, another NSAID (Locenitt SUF ¶¶ 100-101).

At his August 27, 2021 sick-call visit, NP Zaccagnino reviewed Locenitt's chart and denied his request for a shower permit because he had no active abscess, though she advised him to return if one developed and noted his recent refusal of an outside cyst excision (Locenitt SUF ¶¶ 102-105).

According to the medical director and dietician, his then-diet met his allergy needs.  (Locenitt SUF ¶ 107.)  Zaccagnino ordered new insoles, (Locenitt SUF ¶ 110), and noted his Naproxen prescription was still pending in the pharmacy system; the pharmacy reported he had not returned his Ibuprofen but agreed to dispense the Naproxen that day. (SUF ¶¶ 108-109).

In November and December 2021, Zaccagnino continued to manage his care by reviewing CPAP supply issues, updating his asthma rescue plan, conducting an interim asthma assessment, evaluating rectal pain and bleeding, and reviewing lab results. (Locenitt SUF ¶ 111).

63

When Locenitt later complained of hip and knee pain in January 2022, Zaccagnino observed a normal gait but ordered x-rays before determining treatment.  (Locenitt SUF ¶¶ 112-114; Zaccagnino Decl. [23-CV-3399, dkt. no. 179] ¶ 25.)   The hip x-ray showed inflammation, which Zaccagnino believed was appropriately treated with NSAIDs——a drug which Locenitt was already taking. (Locenitt SUF ¶¶ 115-116).  The knee x-ray revealed mild degenerative joint disease, which Zaccagnino also believed was appropriately managed with NSAIDs. (Locenitt SUF ¶¶ 117-118).

Mr. Locenitt testified that he informed Zaccagnino about the efficacy of Neurontin for his chronic pain conditions, but she declined to prescribe it and focused instead on his asthma. (Locenitt Tr. 166:6-167:7.)  Moreover, Locenitt testified that he repeatedly asked Zaccagnino to refer him to pain management and requested a new provider, both of which she declined.  (Locenitt Tr. 113:12-15; 146:15-24; 147:1-15.)

Even assuming these facts to be true, the Court finds that Zaccagnino's treatment of Locenitt from, April of 2021 to January of 2022, was a "reasonable response" to Zaccagnino's sprawling medical conditions, and no jury could find otherwise.  Nunez v. Bentivegna, 2024 WL 3728978, at *4 (S.D.N.Y. Aug. 7, 2024); see also id. at *5 ("mere negligence is not enough to state a claim for deliberate indifference." (citation omitted)).

64

Accordingly, NP Zaccagnino's motion for summary judgment in 23-cv-3399 is GRANTED.

### H. Plaintiff Miller's Claim: 23-cv-3462

In this matter, Dr. John Hammer and Dr. Lester Silver move for summary judgment. (S.D.N.Y. 23-cv-3462, dkt. nos. 103 [Hammer Mot.], 107 [Hammer MOL], 108 [Silver Mot.], 110 [Silver MOL]). Plaintiff McKinley Miller opposes the motion. (23-cv-3462, dkt. no. 130.) Defendants have replied. (23-cv-3462, dkt. nos. 131 [Hammer Reply], 132 [Silver Reply].)

McKinley Miller is an incarcerated individual housed at Green Haven Correctional Facility who has been diagnosed with severe diabetic neuropathy. (Agnew Decl. Ex. 39 [23-cv-3462, dkt. no. 127-114] at M MILLER *71.)  He suffers from radiculopathy and lumbar disc herniation, and underwent multiple spinal surgeries in 2014, 2015, and 2017. (Agnew Decl. Ex. 39 at M MILLER *1-4; Miller SUF [23-cv-3462, dkt. no. 123] ¶¶ 5, 6.)

Mr. Miller has also been diagnosed with spinal stenosis, spondylolisthesis, junctional degeneration, and chronic back pain with left leg numbness. (Miller SUF ¶¶ 5, 11.)  He has carpal tunnel syndrome in his right hand, for which he had surgery in 2007 and has been receiving physical therapy. (Miller SUF ¶ 12.) Although Mr. Miller has no documented history of substance abuse,

he acknowledged during his deposition experimenting with cocaine and marijuana in his teens and early twenties.  (Miller SUF ¶ 3.)

A cervical spine MRI taken on February 8, 2018, revealed deteriorating spinal conditions compared to prior imaging, including multi-level spondylosis, disc bulges, central canal stenosis, and disc herniations throughout his spine.  (Agnew Decl. Ex. 39 at M MILLER *10-12; Miller SUF ¶ 13.)  At that time, Mr. Miller was prescribed oxycodone for pain management. (Miller SUF ¶ 15.)

A CT scan of his lumbar spine without contrast on September 18, 2018, showed diffuse spinal degenerative changes and lumbar stenosis. (Miller SUF ¶¶ 16-17.)  In June 2019,  his treating physician noted Miller's medications, which included Celexa, Cymbalta, Neurontin (600 mg four times a day), and Percocet. (Miller SUF ¶ 18; Agnew Decl. Ex. 39 at M MILLER *17-19.)  Mr. Miller had first been prescribed Neurontin in 2008.  (Miller SUF ¶ 7.)

On September 10, 2019, Mr. Miller underwent cervical spine surgery.  (Miller SUF ¶ 19.)  Following that procedure, he was maintained on Neurontin 600mg and Percocet 5mg three times a day, along with Tylenol, Celexa, and Cymbalta.  (Miller SUF ¶ 20.)

On December 6, 2019, Mr. Miller was transferred to the custody of DOCCS at Downstate Correctional Facility.  (Miller SUF ¶ 23.)

His medication list upon arrival included Neurontin 600mg "TID", Percocet "TID", and Trazodone at night. (Miller SUF ¶ 24.) His intake records documented his chronic pain history, including carpal tunnel surgery and back pain, and noted that he had gait impairment and relied on crutches, a walker, and a wheelchair for long distances. (Agnew Decl. Ex. 39 at M MILLER *20, 21, 24, 25, 28.)

Mr. Miller was admitted to the Downstate infirmary, where Dr. John Bendheim prescribed him Neurontin and Naprosyn but discontinued his opioid prescriptions. (Agnew Decl. Ex. 34 [23-cv-3462 dkt. nos. 127-81, 82, 84, 85] at *12-13, 22, 38-39, 55; Miller SUF ¶ 142.) After this change in his pain management regimen, medical staff characterized his complaints of increased pain as indicating that he seemed "needy." (Miller SUF ¶ 35.)

Mr. Miller attempted to hang himself on December 16, 2019. When discovered, he was reported to be crying and complaining of inadequate pain control. (Miller SUF ¶ 41.) He was placed in a soft cervical collar the following day to provide some relief for his neck pain. (Miller SUF ¶43.)

On December 23, 2019, Mr. Miller was transferred to Green Haven Correctional Facility and placed in the infirmary. (Miller SUF ¶ 56.) His chronic pain and back issues were noted in the transfer documentation. (Miller SUF ¶ 57.) Upon his arrival,

Green Haven medical staff immediately discontinued his gabapentin without any documented medical reasoning, though the nurse who recorded the medication list noted "To Dr. Silver" at the top of the page.  (Agnew Decl. Ex. 34 at *46; Miller SUF ¶¶ 59-60.)

On December 30, 2019, NP Infantino submitted a MWAP request for Neurontin on Mr. Miller's behalf.  (Miller SUF ¶ 65.) Defendant RMD Hammer denied the request, asserting that Neurontin lacked FDA approval for the relevant indication, characterizing its use as "off label," and questioning the precise nature of Mr. Miller's condition.  Hammer recommended tapering the medication off over two weeks and considering alternative drugs without the alleged habit-forming potential of Neurontin.  (Miller SUF ¶ 65.)

Following the denial, Mr. Miller was provided Tylenol for his pain. (Miller SUF ¶ 67.)

Throughout January 2020, Mr. Miller remained in the Green Haven infirmary wearing his soft cervical collar, ambulating with a rolling walker, and receiving only Tylenol for chronic pain. (Agnew Decl. Ex. 39 at M MILLER *43-45.)  Over a three-week period in the infirmary, Mr. Miller reported or was observed to be in pain on thirteen separate occasions.  (Agnew Decl. Ex. 34 at *44-45, 51,55; Miller SUF ¶ 111.) He received a wheelchair permit for long distances on January 13, 2020. (Agnew Decl. Ex. 39 at M MILLER *46.)  On January 6, 2020, a physical therapist documented that

68

Miller had a "very antalgic and unsteady gait."  (Agnew Decl. Ex. 35 [23-cv-3462 dkt. No. 127-86] at 6; Miller SUF ¶ 67.)

Thereafter Mr. Miller was transferred from the infirmary to a cell block, a unit not accessible by wheelchair.  (Miller SUF ¶ 123; Miller Tr. [23-cv-3462 dkt. no. 111-1] 220:6 – 223:19)  On January 18, 2020, he filed an emergency sick call request reporting that his legs were giving out and that he had not received his medication, walker, or brace permits.  His blood pressure was checked and he was returned to his cell without further treatment. (Agnew Decl. Ex. 35 [23-cv-3462 dkt. no. 127-87] at *22.)

On January 23, 2020, Mr. Miller was seen by Defendant Dr. Silver, who noted his prior back surgery, ongoing neck pain, and lower back and leg pain with numbness.  (Miller SUF ¶¶ 107-08.) Dr. Silver ordered an x-ray and maintained the Naproxen prescription, but reduced Mr. Miller's Tylenol prescription and limited how frequently he could take it.  (Agnew Decl. Ex. 35 at *22; Ex. 36 at *12-13, 15; Miller SUF ¶¶ 119, 179.)

Starting on February 5, 2020, Mr. Miller repeatedly complained to medical staff of persistent back, leg, and neck pain, as well as falling in his cell.  (Agnew Decl. Ex. 39 at M MILLER *49, 52-56, 59.)  On February 10, 2020, he reported falling while trying to get out of his cell into his wheelchair.  (Agnew Decl. Ex. 39 at M MILLER *51; Miller SUF ¶ 122.)  Although Mr. Miller

69

had requested a mobility "pusher" on multiple occasions, Dr. Silver did not authorize one until March 25, 2020.  (Agnew Decl. Ex. 38-3 at *395, 396; Miller SUF ¶ 126.)

On April 7, 2020, Dr. Silver noted that Mr. Miller was complaining of back spasms, left leg weakness, "locking up," and upper body weakness.  While Dr. Silver submitted a physiatry referral, it was denied due to the COVID-19 pandemic.  (Miller SUF ¶¶ 129-130; Agnew Decl. Ex. 35 [23-cv-3462, dkt. no. 127-89] at *56-57.)

On May 22, 2020, Mr. Miller was seen by Dr. Silver after being referred from block sick call.  Dr. Silver prescribed no new pain medications and ordered labs to be drawn in July.  (Agnew Decl. Ex. 35 at *69; Miller SUF ¶ 132.)

On May 23, 2020, Mr. Miller filed a grievance stating that Dr. Silver had denied him effective pain medication.  In his grievance, Mr. Miller described his extensive surgical history and stated that upon arriving at Green Haven, all his pain medications had been taken from him, leaving him with only Naproxen and Aspirin.  (Agnew Decl. Ex. 37 [23-cv-3462, dkt. no. 127-103] at *4-5; Miller SUF ¶ 133.)

Mr. Miller also said that during his May 22, 2020 visit, Dr. Silver told him he would not provide any treatment regardless of how many times Mr. Miller sought care, and further stated: "no one

70

told you to do what you did to come here this is your 3rd or 4th bid and you think that we are supposed to take care of you. Well, I do not give a shit about you or any other of you." (Agnew Decl. Ex. 37 at *15.)

On June 9, 2020, Mr. Miller was seen at block sick call for burning pain in his groin and right thigh and was referred to Dr. Silver, who noted the same complaints from the prior visit and but only addressed a scalp issue. (Agnew Decl. Ex. 35 [23-cv-3462, dkt. no. 127-89] at *69, 73.)

On July 10, 2020, Dr. Silver saw Mr. Miller and noted leg cramps and possible neuropathy. His impression included poorly controlled diabetes, likely gastritis from NSAID use, and likely diabetic neuropathy, and he deferred a "PHHY" referral to a later date due to COVID restrictions. (Agnew Decl. Ex. 35 [23-cv-3462, dkt. no. 127-90] at *81, 84.)

On July 15, 2020, Dr. Silver admitted Mr. Miller to the infirmary for poorly controlled diabetes. He was seen again on July 16 and discharged on July 20. On July 27, 2020, Dr. Silver saw Mr. Miller again, noted his pain complaints, and medical records suggest he took no action beyond ordering wheelchair gloves. (Agnew Decl. Ex. 35 [23-cv-3462, dkt. nos. 127-90, 127-91] at *90, 92, 93, 100, 106.)

On October 15, 2020, Mr. Miller's physical therapist concluded that he had achieved maximum benefit from physical therapy for his neck, and PT was discontinued. (Miller SUF ¶ 140.)

On October 21, 2020, Dr. Silver completed an MWAP reassessment acknowledging that both Neurontin and hydrocodone/oxycodone had been helpful to Mr. Miller and had been stopped and that MWAP medication could "maybe" be beneficial. (Agnew Decl. Ex. 39 at M MILLER 69-70; Agnew Decl. Ex. 35 at 136, 138-139.)

Approximately one month later, Mr. Miller was seen by Dr. Charles Argoff for a pain management appointment. Dr. Argoff diagnosed Mr. Miller with severe diabetic neuropathy and recommended a prescription of either Neurontin (gabapentin) or Lyrica (pregabalin) and identified Mr. Miller as an excellent candidate for a spinal stimulator. (Agnew Decl. Ex. 35 at 163, 166; Miller SUF ¶ 146.)

On November 24, 2020, Dr. Silver submitted a MWAP request for Lyrica, which was approved by Defendant Hammer. (Miller SUF ¶¶ 149-150.) Mr. Miller began receiving 75mg of Lyrica twice daily on November 27, 2020. (Miller SUF ¶ 152.)

On February 9, 2021, Lyrica was noted not to be refilled after Mr. Miller appeared at the medication window appearing lethargic and presenting with slow speech while on the medication. (Miller SUF ¶ 154.) He was weaned off Lyrica in the end of February 2021,

72

and he switched to Neurontin by March 2021.  (Miller SUF ¶¶ 157-159.) His Neurontin dosage was subsequently increased on multiple occasions until an effective level was achieved.  (Miller SUF ¶¶ 157, 159, 166, 168, 173, 202.)

By August 10, 2021, Mr. Miller's pain was being managed with Neurontin, naproxen, and Tylenol. (Miller SUF ¶ 172.)

In November 2022, Mr. Miller was diagnosed with prostate cancer. (Miller SUF ¶ 190.) In 2023, it was determined that he required additional back surgery. (Miller SUF ¶ 201.) That surgery was delayed while Mr. Miller underwent radiation therapy for his cancer.  (Id.)

### 1.    Dr. Hammer: Granted

Plaintiff contends that Dr. Hammer's denial of a single MWAP Request on December 30, 2019, shows that Dr. Hammer mechanically applied the MWAP Policy and acted with deliberate indifference to Plaintiff's medical needs.  (Plaintiff's Opposition at 61.)

It is undisputed that in December 2019, NP Infantino submitted a MWAP request for Neurontin on Mr. Miller's behalf and Defendant RMD Hammer denied the request, asserting that Neurontin lacked FDA approval for the relevant indication, characterizing its use as "off label," and questioning the precise nature of Mr. Miller's condition.  Hammer recommended tapering the medication off over two weeks and considering alternative drugs without the alleged

habit-forming potential of Neurontin.  (Miller SUF ¶ 65.)  Indeed, the December 30, 2019, MWAP submitted to Dr. Hammer stated only that Plaintiff was a new indraft who used a wheelchair and had a history of cervical disc fusion two years earlier, along with osteoporosis. It did not identify or reference any diagnostic or radiological testing that may have been performed on Plaintiff. (Miller SUF (Hammer Section) ¶¶ 18-19 (Plaintiff's declaring it is "undisputed that the MWAP Request did not affirmatively provide the information described in Paragraph No. 19").)  In addition, the MWAP Request provided no information regarding Plaintiff's symptoms, the presence or source of any pain, its duration or severity, or any prior pharmacological or therapeutic treatments aside from Neurontin.  Id.

On this record, even resolving all disputed facts in Plaintiff's favor, no jury could find that Dr. Hammer was deliberately indifferent to Plaintiff's needs.  See Nunez, 2024 WL 3728978, at *4-5.

Accordingly, Dr. Hammer is entitled to judgment, and his motion is GRANTED as to Plaintiff's claim of deliberate indifference in 23-cv-3462.

### 2.   Dr. Silver: Denied

Dr. Silver contends that he was not personally involved in any constitutional violation because he was not the provider who

74

discontinued Mr. Miller's medication.  (See 23-cv-3462, dkt. no. 110 at *4-5.)  However, a genuine dispute of material fact exists on this point.  Indeed, the record includes evidence suggesting that when Mr. Miller arrived at Green Haven, a provider listed his medications and crossed out Neurontin as an "error," noting "T.O. Dr. Silver" at the top of the order form.  (Agnew Decl. Ex. 34 [23-cv-3462, dkt. no. 127-84] at *46.)

Moreover, starting on February 5, 2020, Mr. Miller repeatedly complained to medical staff of persistent back, leg, and neck pain, as well as falling in his cell.  Thereafter, Miller consulted with Dr. Silver in April, May, June, July of 2020, but Dr. Silver—arguably—took insufficient actions to remedy Miller's pain.  The Court finds that based on this record, a jury could find that Dr. Silver acted with deliberate indifference.

Moreover, because there are disputed facts related to reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity.  Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, Dr. Silver's motion for summary judgment in 23-cv-3462 is DENIED.

### I. Plaintiff Oleman's Claim: 23-cv-3607

In this matter, Dr. John Hammer, Dr. Robert Bentivegna, and Physician Assistant ("PA") Kathryn Infantino move for summary judgment.  (S.D.N.Y. 23-cv-3607, dkt. nos. 108 [Hammer Mot.], 114

75

[Bentivegna and Infantino Mot.].)  Plaintiff Robert Oleman opposes the motion. (23-cv-3607, dkt. no. 139.)  Defendants have replied. (23-cv-3607, dkt. nos. 144 [Hammer Reply], 147 [Bentivegna and Infantino Reply].)

Mr. Oleman was transferred to Green Haven on January 28, 2020, while receiving 600mg of Neurontin daily as approved by RMD Dinello.  (See Agnew Decl. Ex. 27-1 [23-cv-3607, dkt. no. 138-33] at *12, 14, 18.)  Defendant Infantino conducted Oleman's intake assessment and noted his neuropathy and Neurontin prescription. (Id. at *12-13.)

The next day, Infantino submitted an MWAP request to Defendant Hammer asking to continue the Neurontin prescription that RMD Dinello had approved just three months earlier.  (See id. at *17-19.)  Hammer denied the request on January 30, 2020, stating Neurontin was not FDA-approved for this indication and no studies supported once-daily dosing, instructing a gradual taper over 5-7 days.  (See id. at *21-23.)

Infantino followed Hammer's instructions and ordered a one-week Neurontin supply.  (See id. at *16; Agnew Decl. Ex. 32 [23-cv-3607, dkt. no. 138-46] at *28; Oleman Tr. [23-cv-3607, dkt. no 118-2] *124:8-13; 125:7-13.)

On February 24, 2020, NP Acrish submitted an MWAP request to Hammer for Lyrica for Mr. Oleman's "documented severe sensory diabetic peripheral neuropathy," noting the Neurontin had been

76

discontinued upon transfer. (See Agnew Decl. Ex. 27-2 [23-cv-3607, dkt. no. 138-34] at *36-37.) Hammer denied this request as well, stating that Lyrica is a controlled substance and suggesting Tegretol instead—even though Mr. Oleman was already taking Tegretol 400mg twice daily. (Id.; Agnew Decl. Ex. 27-1 at *35.)

There is evidence that only after Hammer had already denied two MWAP requests for Mr. Oleman did he reach out to colleagues to ask what prior requests they had approved. (See Agnew Decl. Ex. 27-2 at *38-39.) RMD Dinello responded that he had approved Neurontin because Mr. Oleman had "documented severe peripheral neuropathy that failed [five] other medications." (Id.) Hammer did not respond. (Id.)

Over the next year, Mr. Oleman raised his uncontrolled pain to providers nine times, but alternative medications like Cymbalta provided no relief. (See Agnew Decl. Ex. 27-2 at *49, 51-52, 54-57; Ex. 27-3 [23-cv-3607, dkt. no. 138-35] at *81, 89, 102.)

On February 8, 2021, DOCCS replaced the MWAP Policy with Policy 1.24A, which eliminated the approval requirement except for non-formulary medications and required providers to meet with patients before discontinuing pain medications. (See Agnew Decl. Ex. 16 [23-cv-3607, dkt. no. 138-16].)

Despite the policy change, when NP Acrish submitted a non-formulary request to Hammer for Lyrica on March 31, 2021, Hammer denied it the same day, suggesting alternatives instead. (See

77

Agnew Decl. Ex. 28-1 [23-cv-3607, dkt. no. 138-36] at *5-6.)  When NP Acrish resubmitted the request on April 1, 2021, noting Mr. Oleman had failed all formulary alternatives, Hammer again denied the request the same day, stating that "Lyrica is controlled and habit forming."  (Hammer Decl., Ex. F [23-cv-3607, dkt. no. 113-6].)

NP Acrish then forwarded the request to Defendant Bentivegna, who forwarded it to Deputy CMO Carol Moores; she approved it on April 8, 2021.  (See Bentivegna Decl., Ex. A [23-cv-3607, dkt. no. 116-1] at *1-2, 3-4, 6; Agnew Decl. Ex. 31-3 [23-cv-3607, dkt. no. 138-43] at *202.)

The initial Lyrica dose was too strong, causing Mr. Oleman to lose consciousness and fall from his wheelchair on April 11, 2021. (See Oleman Tr. *15:18-17:8; 72:3-73:25.)  On April 12, 2021, he requested to see a doctor for dosage adjustment.  (See Agnew Decl. Ex. 28-1 at *10.)  That evening, when the dosage still had not been adjusted, a nurse told him he must take all his medication; not wanting to fall again, Mr. Oleman took the pills and threw them in the garbage in front of the nurse.  (See Agnew Decl. Ex. 28-1 at *11; Oleman Tr. *16:5-8, 16:14-19.)

On April 13, 2021, without seeing Mr. Oleman or addressing his dosing issues, Bentivegna discontinued the Lyrica prescription, writing that the behavior was "a threat to safety and good order in the facility" whether it was "diversion or

78

carelessness."   (Agnew Decl. Ex. 28-1 at *11; Bentivegna Decl. [23-cv-3607, dkt. no. 116] at ¶¶ 11-12; Oleman Tr. *127:15-19.)

Bentivegna's action may have been in contradiction to Policy 1.24A, which required meeting with the patient and discussing medication issues before discontinuation.  (See Agnew Decl. Ex. 16.) There is evidence that Bentivegna also failed to prescribe alternative medication or input a referral so Mr. Oleman could see his provider.  (See id.; Bentivegna Decl. at ¶¶ 10-15; Agnew Decl. Ex. 33 [23-cv-3607, dkt. no. 138-47] at *1.)

Over a month and a half later, on June 7, 2021, Mr. Oleman was prescribed Cymbalta, which did not relieve his pain.  (Agnew Decl., Ex. 28-2 [23-cv-3607, dkt. no. 138-37] at *29; Oleman Tr. *73:25-74:13.)

On June 30, 2022, Mr. Oleman's counsel wrote to Bentivegna informing him the Lyrica discontinuation violated Policy 1.24A and requesting reinstatement.  (See Agnew Decl. Ex. 29 [23-cv-3607, dkt. no. 138-38] at *14-15.)

Mr. Oleman did not receive Lyrica again until July 6, 2023, when a provider finally prescribed it.  (See Agnew Decl. Ex. 30-1 [23-cv-3607, dkt. no. 138-39] at *22; Ex. 31-5 [23-cv-3607, dkt. no. 138-45] at 235; Oleman Tr. *8:10-19.)

After his Neurontin was discontinued on January 31, 2020, Mr. Oleman's neuropathic pain remained entirely uncontrolled for three years and five months (except for five days in April 2021) until

July 6, 2023. Alternative medications did not ease his pain. (See id. *60:7-61:4.)  During this period, he says he experienced "constant burning, severe burning, pins and needles, numbness, what feels like electrical shocks," rating his pain at nine out of ten. (Id. *75:7-76:2; 115:25-116:3.)  In contrast, when taking Lyrica or Neurontin, his pain level was one or two out of ten. (See Oleman Tr. *114:23-115:24; 9:8-19; 15:4-11.)

### 1.   PA Infantino: Granted

As discussed above, PA Infantino had limited interactions with Oleman.  Infantino evaluated Plaintiff upon his arrival at Green Haven, reviewed his medications, secured an emergency supply, and submitted a required MWAP request to the RMD.  Once the request was denied, Infantino followed the RMD's instructions to taper the drug and directed Plaintiff to his primary care provider.  Infantino lacked authority to continue Neurontin long-term without approval, and the MWAP process offered no appeal or alternative path.  See Daniels v. Mueller, 23-cv-5654 (LAP), 2025 WL 949842, *16 (S.D.N.Y. Mar. 28, 2025) (granting summary judgment to Doctor whom testified she had no ability to fill MWAP prescriptions without approval, and there was no appeal mechanism.)  Although Plaintiff argues that Infantino could have appealed the denial of the RMD's decision by emailing him, (see 23-cv-3607, dkt. no. 139 [Opp.] at *28), it is undisputed that Infantino was not Oleman's primary care provider and, in the

80

limited time she treated him, she ordered him a week's supply of Neurontin and referred him to his primary care provider. (See Agnew Decl. Ex. 32 at *28; dkt. no. 137 [Response to Non-State Defendant's Rule 56.1 Statement] ¶ 5.)

On this record, even resolving all disputed facts in Plaintiff's favor, no jury could find that PA Infantino was deliberately indifferent to Plaintiff's needs. See Nunez, 2024 WL 3728978, at *4-5.

Accordingly, PA Infantino is entitled to judgment, and her motion is GRANTED as to Plaintiff's claim of deliberate indifference in 23-cv-3607.

### 2.    Dr. Bentivegna: Denied

There is evidence that on April 1, 2021, NP Acrish forwarded a non-formulary request to Defendant Bentivegna, who forwarded it to Deputy CMO Carol Moores, and she approved it on April 8, 2021. (See Bentivegna Decl., Ex. A at *1-2, 3-4, 6; Agnew Decl. Ex. 31-3 at *202.)  On April 13, 2021, without seeing Mr. Oleman or addressing his dosing issues, Bentivegna discontinued the Lyrica prescription, writing that the behavior was "a threat to safety and good order in the facility" whether it was "diversion or carelessness."  (Agnew Decl. Ex. 28-1 at *11; Bentivegna Decl. at ¶¶ 11-12; Oleman Tr. *127:15-19.)  Bentivegna's action was likely in contradiction to 1.24A, which required meeting with the patient

81

and discussing medication issues before discontinuation. (See Agnew Decl. Ex. 16.)

There is also evidence that Bentivegna failed to prescribe alternative medication or input a referral so Mr. Oleman could see his provider. (See Agnew Decl. Ex. 16; Bentivegna Decl. at ¶¶ 10-15; Agnew Decl. Ex. 33 at *1.) On June 30, 2022, Mr. Oleman's counsel wrote to Bentivegna informing him the Lyrica discontinuation violated Policy 1.24A and requesting reinstatement. (See Agnew Decl. Ex. 29 at *14-15.) However, Mr. Oleman did not receive Lyrica again until July 6, 2023, when a provider finally prescribed it. (See Agnew Decl. Ex. 30-1 at *22; Ex. 31-5 at 235; Oleman Tr. *8:10-19.)

The Court concludes that on this record, a jury could find that Dr. Bentivegna acted with deliberate indifference.

Moreover, at this stage, "[b]ecause of those same disputed facts, the Court cannot find that [Defendant] is entitled to qualified immunity on the basis of [] objective reasonableness." Daniels v. Mueller, 2025 WL 949842, at *27 (S.D.N.Y. Mar. 28, 2025).

Accordingly, Dr. Bentivegna's motion for summary judgment in 23-cv-3607 is DENIED.

### 3.    Dr. Hammer: Denied

There is evidence that only after Hammer had already denied two MWAP requests for Mr. Oleman did he reach out to colleagues to ask what prior requests they had approved.  (See Agnew Decl, Ex. 27-2 at *38-39.)  RMD Dinello responded that he had approved Neurontin because Mr. Oleman had "documented severe peripheral neuropathy that failed [five] other medications."  (Id.)  Hammer did not respond.  (Id.)

After DOCCS replaced the MWAP Policy with Policy 1.24A, NP Acrish submitted a non-formulary request to Hammer for Lyrica on March 31, 2021.  Hammer denied it the same day, suggesting alternatives instead.  (See Agnew Decl. Ex. 28-1 at *5-6.)  When NP Acrish resubmitted the request on April 1, 2021, noting Mr. Oleman had failed all formulary alternatives, Hammer again denied it the same day, stating that "Lyrica is controlled and habit forming" and suggesting to "try other safer options first." (Hammer Decl., Ex. F.)

Dr. Hammer contests the characterization of his actions as a blanket denial and has provided medical evidence in support of his argument that his denials were based on reasoned medical decisions. (See 23-cv-3607, dkt. no. 109 [Hammer MOL] at *9-19.) Nevertheless, the Court finds that based on this record, a jury could find that Dr. Hammer acted with deliberate indifference.

Moreover, because there are disputed facts on the basis of reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity.  See Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Finally, as to whether Plaintiff failed to exhaust his administrative remedies, "[e]ven assuming Plaintiffs failed to submit grievances for certain MWAP denials, the Court agrees with Plaintiff[] that the record demonstrates administrative remedies were unavailable to Plaintiff[]."  Daniels, 2025 WL 949842, at *28.  Thus, this argument fails as the Court finds that "Plaintiff[] should not be denied the opportunity to pursue [his] grievances in federal court where administrative procedures operated as a dead end to their claims."  Id.  The Court applies this holding to all cases discussed in this order.

Accordingly, Dr. Hammer's motion for summary judgment in 23-cv-3607 is DENIED.

### J. Plaintiff Perez's Claim: 23-cv-3300

In this matter, Dr. Christopher Wright and NP Kristin Salotti move for summary judgment.  (S.D.N.Y. 23-cv-3300, dkt. nos. 143 [Wright Mot.], 147 [Wright MOL], 150 [Salotti Mot.], 154 [Salotti MOL]).  Plaintiff Joseph Perez opposes the motion.  (23-cv-3300, dkt. no. 170.)  Defendants have replied.  (23-cv-3300, dkt. nos. 172 [Salotti Reply], 173 [Wright Reply].)

Preliminarily, while Dr. Wright moves for the Court to strike portions of Perez's Rule 56.1 counterstatement, (23-cv-3300, dkt. no. 173 at *1-2), the Court declines to do so.  See Primmer, 667 F. Supp. 2d at 254.

### 1.   NP Salotti: Granted

Plaintiff alleges that NP Salotti acted with deliberate indifference to his medical needs when she denied his request for an egg-crate mattress on January 2019; when she prescribed only Elavil or Pamelor between January 2019 and June 2019; and when she submitted MWAP Requests for Baclofen in July 2019 and September 24, 2019.  (See Compl. [23-cv-3300, dkt. no. 1] ¶¶ 334, 337-40, 343-44.)

Regarding the statute of limitations, Plaintiff filed his complaint on April 20, 2023.  (See S.D.N.Y. 23-cv-3300, dkt. no. 1.)  The Court finds that—after adding 228 days to the tolling period to account for the COVID-19 Pandemic, see Benites v. New York Dep't of Corr. & Cmty. Supervision, 2023 WL 1966181, at *4 (S.D.N.Y. Feb. 13, 2023)—the allegations that predate September 4, 2019, are barred by the three-year statute of limitations.  See Owens v. Okure, 488 U.S. 235, 251 (1989) (A three-year statute of limitations applies to New York claims brought pursuant to 42 U.S.C. § 1983).  Accordingly, Plaintiff's claims regarding NP Salotti's medical treatment in January 2019, June 2019, and July 2019 are time-barred.

As to the September 24, 2019, interaction, in that visit, NP Salotti saw Mr. Perez, who reported experiencing muscle spasticity and stated that Baclofen provided relief.  (Agnew Decl. Ex. 30 [dkt. no. 167-62] at *59.)  NP Salotti resubmitted an MWAP Request for Baclofen 10 mg twice daily, noting that it was intended to treat Plaintiff's chronic full-body pain with spasticity and his full-time use of a wheelchair, and Dr. Dinello approved it the same day.  (Perez SUF [dkt. no. 163] (Salotti Section) ¶¶ 38, 39.)

Thereafter, on October 22, 2019, NP Salotti initially submitted an MWAP Request to RMD Dinello seeking to increase Plaintiff's Baclofen dosage from 10 mg to 20 mg twice daily. (Agnew Decl. Ex. 30 at 78-80; SUF ¶ 41.)  On November 7, 2019, NP Salotti then submitted a modified MWAP Request to RMD Dinello, again requesting the same increased Baclofen dosage, and Dr. Dinello approved it on that day.  (Perez SUF ¶¶ 41, 43.)

On this record, even resolving all disputed facts in Plaintiff's favor, no jury could find that NP Salotti was deliberately indifferent to Plaintiff's needs in September 2019. Indeed, as plaintiff's counsel points out, (Pl. Opp. [dkt. no. 170] at 42), in September 2019, Mr. Perez reported that Baclofen was helping, and NP Salotti submitted an MWAP request for that very treatment.

Moreover because——as a matter of law——NP Salotti's actions in September 2019 were not deliberately indifferent, those actions cannot serve as a "non-time-barred act[]" that resurrects Perez's other untimely claims through the continuing violation doctrine. See Daniels v. Mandalaywala, 2024 WL 3566990, at *7 (N.D.N.Y. July 29, 2024).

Accordingly, NP Salotti's motion for summary judgment in 23-cv-3300 is GRANTED.

### 2.   Dr. Wright: Denied

Dr. Wright became Mr. Perez's primary care physician on April 30, 2020.  (Perez SUF (Wright Section) ¶ 1.)  On July 14, 2020, when Mr. Perez requested a cushion to prop himself up in bed while reporting significant neck, back, and arm pain, Dr. Wright responded to the request, noting there was no indication for additional equipment. (Id.  ¶¶ 20-21.)

At his first in-person meeting with Mr. Perez on July 29, 2020, Dr. Wright documented that Mr. Perez was "constantly uncomfortable" and hoping for "anything to better control pain" and noted that he was considering increasing Mr. Perez's Baclofen dosage.  (Id.  ¶¶ 23-26; Agnew Decl. Ex. 31 [23-cv-3300, dkt. no. 167-65] at *39.)  No such increase occurred for more than four months, despite Dr. Wright's being reminded of the plan on August 14, 2020.  (Perez SUF ¶ 26; Agnew Decl. Ex. 31 at *39.)

On October 6, 2020, Dr. Wright conducted a chronic pain reassessment and documented that Mr. Perez's last formal pain management evaluation had occurred nearly seven years earlier, that his wheelchair reliance was "longstanding" and "greater than 15 years," and that Mr. Perez clearly stated that not enough was being done to control his pain.  (Perez SUF ¶¶ 34-37, 94; Agnew Decl. Ex. 31 [23-cv-3300, dkt. no. 167-66] at *53.)  Dr. Wright's recommendations were to restart Elavil and to try a short course of Prednisone.  (SUF ¶¶ 32, 39.)  On October 20, 2020, when Mr. Perez returned and reported that Prednisone had not helped and that he was experiencing pain at a 6/10 level, Dr. Wright made no adjustments to his pain medication.  (SUF ¶ 51; Agnew Decl. Ex. 31 at *61.)

DCMO Moores referred Mr. Perez to a pain management specialist in November 2020.  (SUF ¶ 63.)  When DCMO Moores approved buprenorphine in January 2021, Dr. Wright wrote privately to RMD Dinello expressing his view that there was no real basis for prescribing a narcotic, describing Mr. Perez as obsessed with pain and narcotics, and stating: "Carol Moores is driving this ship." (SUF ¶ 63; Agnew Decl. Ex. 32 [23-cv-3300, dkt. no. 167-69] at *6.)

In January 2021, Dr. Wright began treating Mr. Perez with the narcotic buprenorphine (i.e. "Belbuca").  (SUF ¶ 72.)  Once Belbuca was titrated to an effective dose, Mr. Perez reported that his

88

pain had reached a manageable level for the first time.  (Perez SUF ¶¶ 76-78, 84.)

In short, there is evidence that between April 30 and November 4, 2020, Mr. Perez reported chronic, constant pain while under Dr. Wright's care approximately nine times.  (Perez SUF ¶ 94; Agnew Decl. Ex. 31 at *2, 9, 31, 39, 53-55, 61, 79, 81.)  A jury could reasonably conclude that despite these ongoing complaints, Dr. Wright did not take steps that could be viewed as reasonable or appropriate efforts to manage or treat Mr. Perez's pain at that time.

And furthermore, the Court finds that based on this record, a jury could find that Dr. Wright acted with deliberate indifference.

Moreover, because there are disputed facts on the basis of reasonableness, the Court cannot find that Defendant is entitled to summary judgment on the basis of qualified immunity.  See Daniels, 2025 WL 949842, at *27; see also Husain, 494 F.3d at 133.

Accordingly, Dr. Wright's motion for summary judgment in 23-cv-3300 is DENIED.

### K. Plaintiff Van Guilder's Claim: 23-cv-3398

In this matter, Dr. David Karandy moves for summary judgment. (S.D.N.Y. 23-cv-3398, dkt. nos. 131 [Mot.], 135 [MOL].)  Plaintiff Christopher Van Guilder opposes the motion.  (23-cv-3398, dkt. no.

161 [Opp.].)  Defendant has replied.  (23-cv-3398, dkt. no. 166 [Reply].)

Preliminary, while Defendant moves for the Court to strike portions of Plaintiff's Rule 56.1 counterstatement, the Court declines to do so.  See Primmer, 667 F. Supp. 2d at 254.

### 1.    Dr. Karandy: Granted

Mr. Van Guilder transferred into Washington Correctional Facility ("WCF") in May of 2018.  (Van Guilder SUF [23-cv-3398] ¶ 1.)    When Van Guilder arrived at WCF, he was taking Lamictal/Lamotrigine and Coumadin/Warfarin.  (Van Guilder SUF ¶ 2.)  And upon his arrival he was primarily under the care of Dr. Neil Trachtman until July 2019, although there is evidence that Dr. Karandy was involved in his care at that time too.  (Van Guilder SUF ¶¶ 3-4.)  Thereafter, Dr. Karandy took over as Facility Health Services Director ("FHSD") and Van Guilder was under his care from July 2019 to June 2020.  (Van Guilder SUF ¶¶ 4-5.)

Mr. Van Guilder's Neurontin prescription had been discontinued at a previous facility, at least 21 months before he came under Dr. Karandy's primary care.  (Van Guilder SUF ¶¶ 8, 14.)  Van Guilder first clinical visit with Dr. Karandy was on July 8, 2019.  (Van Guilder SUF ¶ 15.)

In that visit, Dr. Karandy conducted a medical assessment addressing multiple co-existing conditions, including back pain, prior vascular surgery, sleep apnea, elevated cholesterol, asthma,

and a history of blood clots requiring blood thinners. (Karandy Decl. ¶ 21 [23-cv-3398 dkt. no. 133]; Karandy Decl. Ex. A, [23-cv-3398 dkt. no. 133-2] *124-129)

Dr. Karandy also noted Van Guilder's history of laminectomy and a prior epidural steroid injection, and noted "continue Lamotrigine" (i.e. Lamictal). (Van Guilder SUF ¶¶ 17-18; Agnew Decl. Ex. 48-3 at 2-3.)

Later that month, on July 23, 2019, Van Guilder was seen by pain specialist Dr. Narayan, whose referral had originated from a note by Dr. Trachtman dated April 9, 2019, stating that Van Guilder had not responded to spinal injections and that ibuprofen did not relieve his symptoms. (Van Guilder SUF ¶ 19; Agnew Decl. Ex. 48-3 at *17.)

Dr. Narayan recommended: (1) consider starting Lamictal at 50mg; (2) discontinuing Cymbalta "if not helpful"; (3) considering reevaluation "with a spine surgeon"; and (4) following up "as needed." (Van Guilder SUF ¶¶ 19-20; Agnew Decl. Ex. 48-3 at 17.) There is evidence that Dr. Narayan reviewed these recommendations on January 14, 2020. (Agnew Decl. Ex. 48-3 at *17.)

At the time of that appointment in July 2019, Van Guilder was already on a higher dose of Lamictal (100 mg) than what Dr. Narayan recommended, and Van Guilder was not taking Cymbalta. (Van Guilder SUF ¶ 21; Agnew Decl. Ex. 52 at 12.)

In early August 2019, Van Guilder presented with an unexplained dermatitis involving a significant portion of his body.  (Van Guilder SUF ¶ 22.)  Dr. Karandy prescribed topical medications and placed Van Guilder's Lamictal on hold due to its association with Stevens-Johnson Syndrome, a potentially life-threatening condition.  (SUF ¶¶ 23-24, 26-27.)

On August 9, 2019, Dr. Karandy noted that the rash had resolved and advised Van Guilder to remain off Lamictal, noting he was "not 100% certain" Lamictal had caused the rash "but PT to remain off medication for now."  (Agnew Decl. Ex. 48-3 at *26; SUF ¶ 25.)

Dr. Karandy did not prescribe any substitute pain medication at that time.  (Agnew Decl. Ex. 48-3 at *26; Agnew Decl. Ex. 52 at *12-13.)

On the morning of August 20, 2019, Van Guilder appeared at sick call requesting to speak to the doctor, seeking an alternative pain medication for his back.  (Van Guilder SUF ¶¶ 29-30.)  The nurse noted that Van Guilder had a pending follow-up with the doctor and left the health record for the doctor to review.  (Van Guilder SUF ¶ 31.)  However, later that same morning, Van Guilder, who takes blood thinners, appeared at sick call with a 2 inch by 1.5 inch bruise.  (Van Guilder SUF ¶ 32.)  That condition was significant enough to result in nursing staff having to place a tourniquet on his arm and apply pressure.  (Van Guilder SUF ¶ 33.)

92

Dr. Karandy declared that "[a]s such [Van Guilder's] chart was sequestered by nursing staff and was physically removed from where it had been placed for physician review."  (Karandy Decl. [23-cv-3398, dkt. no. 133] ¶ 26)  However, Plaintiff asserts that the medical chart documents nothing about it being removed from physician review on account of the tourniquet bruising incident. (Van Guilder SUF ¶ 34 (Response).)

On September 20, October 22, November 8, December 16, Dr. Karandy renewed Van Guilder's prescription for Warfarin but he did not prescribe anything for his pain.  (Agnew Decl. Ex. 48-4 at *6, 13, 21, 22.)  However, there is no record that Van Guilder renewed his request for pain medication during this timeframe; and Van Guilder does not assert that he did.[7]  Indeed, from August 20, 2019, through January 12, 2020, there were no sick call slips indicating that Van Guildner requested pain medication.  (Van Guilder SUF ¶ 36.)  In fact, the record includes no sick call entries at all during that period.  (Van Guilder SUF ¶ 36.)

Then, on January 12, 2020, Van Guilder presented to sick call where several medical issues were addressed.  (Van Guilder SUF ¶ 42.)  On January 14, 2020, Dr. Karandy conducted a general care

---

[7] Although, Van Guilder stated in his deposition that he asked Dr. Karandy to prescribe Neurontin more than five times.  (Van Guilder Tr. [23-cv-3398, dkt. no. 134-2] *178:16-23.)  Van Guilder did not provide any details whatsoever as to when or where he made such requests and he did not testify that he made these requests between August 2019 and January 2020.

visit addressing multiple issues, including lower back pain. (SUF ¶ 44.)

At this visit, Dr. Karandy prescribed Tegretol/Carbamazepine 100mg twice per day for pain and he specifically explained to Van Guilder, as is documented in his note, that he would see him anytime.  (Karandy SUF ¶¶ 51-52.)

Thereafter, Dr. Karandy's notes from February 2020 reflect that Van Guilder reported Tegretol was helping his pain, and Dr. Karandy renewed the prescription for six months.  (Van Guilder SUF ¶¶ 58-59.)  Van Guilder, testified at deposition that Tegretol did not improve his pain level although he did not testify that he communicated this to Dr. Karandy.  (Van Guilder Tr. 84:9-23.)

Dr. Karandy continued to see Van Guilder through the spring of 2020, addressing a left orbital bruise in March, reviewing a normal x-ray in April, and noting at a May 1, 2020, appointment that Van Guilder would be leaving DOCCS in approximately four months.  (Van Guilder SUF ¶¶ 63-69.)

In June 2020, Van Guilder was transferred to Greene Correctional Facility, ending Dr. Karandy's care, with Van Guilder still taking Tegretol at the time of transfer. (Van Guilder SUF ¶¶ 70-71.)

In sum, Van Guilder's primary contention is that from August 2019 to January 2020, Dr. Karandy did not prescribe any pain medication at all.  However, Dr. Karandy's sworn statement is that

94

Van Guilder's chart——regarding the August 20 request——was removed from the sick call area and thus the request did not reach him. (Karandy Decl. 26.)  And there is no evidence that contradicts this.  Moreover, there is no medical or jail record indicating that Van Guilder sought pain medication from Dr. Karandy between (the misplaced) August 2019 request and January 2020, when Dr. Karandy prescribed Tegretol/Carbamazepine 100 mg and told Plaintiff he could return at any time.

And, although Van Guilder testified that he asked Dr. Karandy more than five times for pain medication, he did not provide any details about such requests, such as when or where he made them. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("mere existence of a scintilla of evidence in support of the plaintiff's position will not be sufficient").

Considering these undisputed facts, the Court finds that Dr. Karandy's treatment of Van Guilder was a "reasonable response" to Van Guilder's medical conditions, and no jury could find otherwise. See Nunez, 2024 WL 3728978, at *4-5.

Accordingly, Dr. Karandy's motion for summary judgment in 23-cv-3398 is GRANTED.

## L. Plaintiff Wilkerson's Claim: 23-cv-3397

In this matter, Dr. John Hammer, Dr. Lester Silver, and Dr. Robert Burke move for summary judgment.  (S.D.N.Y. 23-cv-3397, dkt. nos. 151 [Burke/Silver Mot.], 152 [Burke/Silver MOL], 158

95

[Hammer Mot.], 161 [Hammer MOL]).  Plaintiff Mali Wilkerson opposes the motion.  (23-cv-3397, dkt. no. 178.)  Defendants have replied.  (23-cv-3397, dkt. nos. 187 [Hammer Reply], 189 [Burke/Silver Reply].)

Plaintiff Mali Wilkerson alleges that Defendants Dr. John Hammer, Dr. Lester Silver, and Dr. Robert Burke were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  For the reasons that follow, the motions are DENIED.[8]

Plaintiff Wilkerson was in DOCCS' custody from July 2019 through February 2023.  Wilkerson was first housed at Downstate Correctional Facility (a reception center) and subsequently transferred to Green Haven Correctional Facility ("GHCF") from July 2, 2019 to May of 2022.  Wilkerson was then housed at Marcy Correctional Facility from May 2022 until his 2023 release.  (23-cv-3397, dkt. no. 153, Silver/Burke 56.1 ¶¶ 33-34 (undisputed).)

It is undisputed that Wilkerson has long suffered from sickle cell anemia as well as avascular necrosis in both hips, osteoporosis, Scheuermann's disease, and sickle cell retinopathy.  (Silver/Burke 56.1 ¶¶ 37-39 (undisputed).)  Wilkerson's sickle cell conditions cause chronic, severe pain.  Wilkerson has been treated with various opioid pain medications—including MS Contin

---

[8] In this section, citations to Agnew Decl. Ex. 29 refer to excerpts of Wilkerson's hearing testimony.

(morphine sulfate), Percocet (oxycodone/acetaminophen), Norco (hydrocodone), and fentanyl—alongside Hydroxyurea for the underlying sickle cell disease since at least 2013. (Silver/Burke 56.1 ¶¶ 41, 52, 66–67 (undisputed).)

During the relevant time period, Defendant Hammer served as an RMD for Wilkerson's facilities. (23-cv-3397, dkt. no. 162, Hammer 56.1 ¶ 2 (undisputed).) Defendant Silver was a primary care physician who treated Wilkerson at GHCF. Defendant Burke was also a primary care physician who treated Wilkerson for approximately two months at Marcy before retiring.[9] (Silver/Burke 56.1 ¶ 422 (undisputed).)

Upon his arrival at Downstate in July 2019, medical personnel reported that Wilkerson used a wheelchair for extended periods and had orders for an extra mattress due to his hip condition. (Silver/Burke 56.1 ¶ 80 (undisputed).) Wilkerson was initially seen by Dr. Bendheim, who continued Wilkerson on his full medication regimen, including MS Contin, Percocet, Flexeril, L-Glutamine, Hydroxyurea, and all vitamins and supplements from Albany County Jail. (Silver/Burke 56.1 ¶ 81 (undisputed).) No MWAP approval was required at this point because Downstate was a reception center. (Silver/Burke 56.1 ¶ 82 (undisputed).)

---

[9] At GHCF, Wilkerson was also treated by Dr. Robert Bentivegna (the Facility Health Services Director, or "FHSD", who oversaw the infirmary), PA Katie Infantino, and Dr. Susan Mueller. (Silver/Burke 56.1 ¶¶ 103, 106 (undisputed).)

97

Treatment at GCHF

On July 1, 2019, one day before Wilkerson's transfer from Downstate to GHCF, a nurse at Downstate alleged that Wilkerson was "cheeking" his MS Contin or allegedly retaining the pill to return to his cell and distribute it.  Although the contents of the nurse's note are undisputed, the alleged cheeking incident itself is hotly contested.  Wilkerson testified under oath that the incident did not happen, and eyewitness Reginald Tolliver has submitted an affidavit corroborating Wilkerson's account.  (23-cv-3397, dkt. no. 157-4, Kiley Decl. Ex. D ("Wilkerson Dep.") 66:13–67:15; 23-cv-3397, dkt. no. 173-30, Agnew Decl. Ex. 28 at 2–4.)  This single cheeking incident, however, would ultimately shape the next eighteen months of Wilkerson's medical care while in DOCCS custody.

After his July 2, 2019, transfer to GHCF, Wilkerson was seen by PA Kathryn Infantino.  PA Infantino submitted MWAP requests to continue Wilkerson's then-existing treatment on MS Contin (30 mg), Percocet (5/325 mg), and Flexeril (10 mg TID).  (Silver/Burke 56.1 ¶ 112; Hammer 56.1 ¶¶ 15-17 (undisputed).)  The MWAP form noted that Wilkerson was a new transfer with sickle cell disease and AVN in both hips requiring a wheelchair but stated that he "was caught cheeking his MS CONTIN on 7/1/19[.]"  (Hammer 56.1 ¶ 16 (undisputed).)  PA Infantino also submitted a referral for hematology and advised that Wilkerson would be closely monitored

98

in the infirmary pending Hammer's decision.  (Hammer 56.1 ¶¶ 9, 14 (undisputed).)

It is undisputed that Hammer denied all three of these MWAP requests in July 2019 without ever examining Wilkerson. (Silver/Burke 56.1 ¶ 113 (undisputed); Hammer 56.1 ¶ 18 (undisputed).)  As to the request to continue Wilkerson's regimen of Percocet, Hammer stated that: "HSPM policy 1.24 has the provision that if a patient is cheeking opiate medication then it should be d/c/d [discontinued]. I would agree with this in principle. Suggest taper off Percocet over 30 days." (Hammer 56.1 ¶ 32 (undisputed); 23-cv-3397, dkt. no. 159-6, Luo Decl. Ex. F at 7 (emphasis added).)

With respect to MS Contin, Hammer also suggested that the dosage be tapered and that Wilkerson be referred to hematology. Hammer also noted that the doctors should "consider [the hematologist's] advice regarding pain management going forward" and that "it may be necessary to continue a lower dose indefinitely." (Luo Decl. Ex. F at 5; Hammer 56.1 ¶ 23.)  Although there is some dispute as to the degree to which Wilkerson's dosage was "tapered," it is undisputed that PA Infantino subsequently discontinued both MS Contin and Percocet entirely.

Wilkerson was subsequently seen by a DOCCS hematologist, Dr. Asif.  Dr. Asif, disagreeing with Dr. Hammer, recommended that Wilkerson resume his regimen of MS Contin (30 mg) and Oxycodone

(10 mg), as well as Q6H PRN for breakthrough pain and a non-opioid—Endari. (Hammer 56.1 ¶¶ 45-46 (undisputed); 23-cv-3397, dkt. no. 157-20, Kiley Decl. Ex. K-4 at *1532.)

Following his consultation with Dr. Asif, Plaintiff saw Dr. Silver.  Dr. Silver reviewed the recommendations of Wilkerson's hematology consultation with Dr. Asif, which stated Dr. Asif's recommendation that Wilkerson take MS Contin and Oxycodone. (Silver/Burke 56.1 ¶ 140 (undisputed).)  However, rather than submitting formal MWAP forms to request that Wilkerson continue this regimen, Silver emailed Hammer informally.  In an August 5, 2019, email to Hammer, Silver stated that he "thought it might save time and unnecessary effort to ask [Hammer] if [he] would consider approving any of the foregoing meds, before [Silver] invest[s] the time in filling out 2 or 3 MWAP forms."  (Hammer 56.1 ¶ 47 (undisputed).)  Silver noted that he was aware that Hammer had previously declined to approve controlled substances for Wilkerson and that he was "only revisiting the issue because of Dr. Asif's recommendations" that MS Contin and Oxycodone be prescribed.  (Hammer 56.1 ¶ 48 (undisputed).)

In his response to Silver's email, Hammer again referenced the purported cheeking incident.  Hammer observed that "on this basis alone, the policy 1.24 states [sic] that this disqualifies a patient from further narcotics on a justifiable basis" and that Hammer "agree[d] with that."  (Hammer 56.1 ¶ 50 (undisputed)

100

(emphasis added); 23-cv-3397, dkt. no. 159-8, Luo Decl. Ex. H at 2.)[10]   However, Hammer provided Dr. Asif's phone number so Silver could discuss treatment with Dr. Asif (Hammer 56.1 ¶ 57 (undisputed)), and concluded his email: "[U]ltimately, you must use your judgment weighing the facts."   (Hammer 56.1 ¶ 58 (undisputed).)   Silver then replied that he "did not know that [Wilkerson] had been caught cheeking meds, and [] certainly agree that that would disqualify [Wilkerson] from receiving [opioids]." (Hammer 56.1 ¶ 61 (undisputed) (emphasis added).)

Following this exchange with Dr. Hammer, on August 6, 2019, Dr. Silver examined Wilkerson and told Wilkerson that his medications would not be approved by Hammer because of the cheeking incident, despite the recommendation of Dr. Asif.   (Silver/Burke 56.1 ¶ 159 (undisputed).)   Wilkerson further testified that Silver told Wilkerson that any denials of opioids would need to be taken up with Hammer.   (Wilkerson Dep. 291:15-17 ("[Silver] always told me, take it up, take it up with Hammer, take it up with Hammer. That was his thing when he denied me certain things.").)

In lieu of opioids, Silver prescribed Ibuprofen and continued Wilkerson on Hydroxyurea, vitamins, and other non-controlled medications.   But these medications, according to Wilkerson, were ineffective in managing Wilkerson's excruciating pain.   At the

---

[10]   Hammer did approve a prescription of Endari for Wilkerson. (Hammer 56.1 ¶ 55 (undisputed).)

same time, Wilkerson's continued consumption of Ibuoprofen also triggered negative side effects. For example, on August 9, 2019, Wilkerson attended sick call complaining of sickle cell pain and burning in his stomach. (Silver/Burke 56.1 ¶ 165 (undisputed).) On September 3, Silver provided Omeprazole for stomach complaints and requested a special diet. (Silver/Burke 56.1 ¶¶ 168-169 (undisputed).)

On November 11, 2019, Wilkerson complained that he had "great pain in his hips," causing him to be up all night and miss morning medications. (Silver/Burke 56.1 ¶ 180 (undisputed).) On November 12, Wilkerson was seen at sick call complaining of bilateral hip, back, and left shoulder pain. (Silver/Burke 56.1 ¶ 182 (undisputed).) Wilkerson's sick call slips and grievances throughout this period confirm this general theme: "I'm in a lot of pain," "My hips and shoulders still ache," "my hips are still causing me great pain," and "the naproxen/ibuprofen is only hurting my stomach." (23-cv-3397, dkt. no. 157-22, Kiley Decl. Ex. K at *1726, 1737, 1813, 1832, 1849; 23-cv-3397, dkt. no. 157-23, Ex. L-1 at *21, 23.) And Wilkerson later testified that "[Ibuprofen] didn't do anything for my pain" and "didn't touch my pain really." (Wilkerson Dep. 72:3-23.)

On February 12, 2020, Wilkerson was attacked by another inmate, triggering a sickle cell crisis. (Silver/Burke 56.1 ¶¶ 191, 199 (undisputed).) He was admitted to Westchester Medical

Center, underwent facial fracture surgery, and remained hospitalized until February 28. (Silver/Burke 56.1 ¶¶ 198–199 (undisputed).) While hospitalized, Wilkerson was placed on Dilaudid, an opioid medication, to control his pain. (Silver/Burke 56.1 ¶ 200 (undisputed).) After discharge, Wilkerson received Percocet in the GHCF infirmary until March 8, when PA Infantino discontinued it. (Silver/Burke 56.1 ¶¶ 203–204 (undisputed).)

After that, Wilkerson was once again placed on Ibuprofen alone. On April 1, 2020, Wilkerson suffered fever, significant left flank pain, blood in his urine, and sickle cell pain. (Silver/Burke 56.1 ¶ 222 (undisputed).) He was sent to Montefiore Mount Vernon Hospital, where he was placed on a Dilaudid IV for pain and treated for possible COVID-19. (Silver/Burke 56.1 ¶¶ 223, 225–226 (undisputed).) He was discharged on April 13, 2020, with a recommendation to continue MS Contin 30 mg twice daily. (Silver/Burke 56.1 ¶ 229 (undisputed).) This recommendation, however, was not followed, and Wilkerson continued to be denied any prescription opioids for pain management. (Silver/Burke 56.1 ¶ 231 (undisputed).)

In December 2020, after a second hematology consultation, Dr. Asif again recommended MS Contin 30 mg BID, Oxycodone 5 mg Q6H PRN, Gabapentin 100 mg TID, and Endari. (Silver/Burke 56.1 ¶ 315 (undisputed).) Silver reviewed these findings but again declined to submit an MWAP for MS Contin. Instead, Silver initially

submitted an MWAP request for Gabapentin only, which Hammer approved the same day.  (Silver/Burke 56.1 ¶ 322 (undisputed).)

Within weeks, Wilkerson reported that Gabapentin was "not working" and made him sick.  (Silver/Burke 56.1 ¶¶ 325, 327 (undisputed).)  On December 28, 2020, Silver again asked Hammer for permission to prescribe MS Contin for Wilkerson.  (Silver/Burke 56.1 ¶ 328 (undisputed).)

At first, Dr. Hammer appeared unwilling to prescribe MS Contin.  (Silver/Burke 56.1 ¶ 334 (undisputed).)  Hammer noted that he had denied prior MWAP requests for MS Contin and noted that he "underst[oo]d . . . that sicklers are in some degree of chronic pain but there are choices other than opiates for pain management especially in a patient once caught cheeking."  (23-cv-3397, dkt. no. 159-15, Luo Decl. Ex. O at 3).  Silver responded that the "patient was in pain" and that he "[did] not have a viable alternative medication to offer[.]" (Id.)  Once again, Hammer resisted, suggesting that Silver "seek an alternative pain management approach . . . before resorting to opiates."  (Id.) Silver also added Dr. Moores, a pain medication specialist, to the email chain.  Two days later, Dr. Moores opined that "[r]egardless of the history of diversion, it may still be the right answer to consider MS Contin again." (Id. at 2.)  Dr. Moores also suggested that Dr. Silver contact Dr. Argoff of the Albany Pain Management Clinic to discuss the issue.

104

After Dr. Moores' intervention, Dr. Hammer ultimately approved a January 15, 2021, MWAP from Silver for 15 mg of MS Contin. (Silver/Burke 56.1 ¶ 335 (undisputed).)  Initially, Hammer initially approved only a 7-day supply of MS Contin.  (Silver/Burke 56.1 ¶ 336 (undisputed).)  On January 25, 2021, Silver again raised the issue, and Hammer approved MS Contin 15 mg for 180 days. (Silver/Burke 56.1 ¶¶ 340–341 (undisputed).)[11]

Following the January 2021 MWAP approval—and DOCCS' mid-litigation decision to rescind the MWAP policy entirely—Silver continued to maintain Wilkerson on MS Contin 15 mg and submit specialty referrals for the duration of Wilkerson's time at GHCF. (Silver/Burke 56.1 ¶ 345 (undisputed).)  Wilkerson testified that the newly-approved 15 mg dosage managed his pain "for the most part." (Hammer 56.1 ¶ 80 (undisputed).)

Silver ultimately retired from DOCCS in February 2022. (Silver/Burke 56.1 ¶ 389 (undisputed).)  At the time of his retirement, Silver allegedly confessed to Plaintiff that he was retiring because "he can't do what he does in DOCCS . . . what he went to school for," that DOCCS was "making [Silver] go against

---

[11] Plaintiff contends that Hammer initially resisted and circulated the old MWAP forms referencing cheeking, reversing course only because of Dr. Argoff's and Dr. Moores's involvement (and, presumably, this litigation). (23-cv-3397, dkt. no. 173-27, Agnew Decl. Ex. 25 at *282.)

what he believed," and that Silver "fel[t] powerless" in the face of "too much control" from DOCCS.  (Wilkerson Dep. 150:2-10.)

<u>Treatment at Marcy</u>

Wilkerson was transferred to Marcy on or about May 19, 2022. (Silver/Burke 56.1 ¶ 397; 23-cv-3397, dkt. no. 157-29, Kiley Decl. Ex. L-3 at *1077.)  By this point, DOCCS had rescinded the MWAP Policy over a year earlier. (Silver/Burke 56.1 ¶¶ 22-23 (undisputed).)

It is undisputed that Defendant Burke saw Wilkerson on May 20, 2022.  (Silver/Burke 56.1 ¶ 405 (undisputed).)  From there, however, accounts diverge.  According to Burke, Burke discussed the potential downsides of opioids with Wilkerson, after which Wilkerson voluntarily agreed to discontinue MS Contin and exclusively manage his pain with Tylenol and Ibuprofen. (Silver/Burke 56.1 ¶¶ 406-407.)  But Wilkerson's sworn testimony tells a different story.  According to Wilkerson, Burke told him there was "no pain management . . . in the facility." (Wilkerson Dep. 151:15-16.)  Burke also told Wilkerson that his "hands were tied because this is how DOCCS does things" and that "if [Wilkerson] was in his private practice in the streets, automatically, [Wilkerson] would get the pain meds because [his] conditions call for it, it's textbook stuff."  (23-cv-3397, dkt. no. 173-31, Agnew Decl. Ex. 29, Tr. 272:12-17.)  Wilkerson also

unequivocally denies that he agreed to discontinue his medication. (Id. at 273:14-16.)

Plaintiff's counsel also notes that Burke's chart notes about the May 20 meeting (in which Burke claims that Wilkerson agreed to try Ibuprofen and Tylenol) were not entered on May 20 but on May 27—after the Court held a telephone conference in the related Allen v. Koenigsmann case on the same date. (Kiley Decl. Ex. L-3 at *1090; Allen Dkt. Nos. 376–377.) In any event, it is undisputed that Burke later reversed his decision and that Wilkerson began receiving MS Contin on May 27. (Silver/Burke 56.1 ¶ 414 (undisputed).) It is further undisputed that Burke continued Wilkerson's dosage of MS Contin until his retirement approximately two months later. (Silver/Burke 56.1 ¶¶ 422–425 (undisputed).)

## 1. Defendant Hammer: Denied

Plaintiff has created triable issues of fact as to whether Dr. Hammer was deliberately indifferent to Plaintiff's medical condition.

First, there is clearly a triable issue of fact as to whether Wilkerson had an objectively serious medical condition and was deprived of medical care. It is undisputed Wilkerson suffers from conditions that inflict chronic pain, including sickle cell disease, and that Hammer nonetheless denied all three MWAP requests, thereby effectively discontinuing Wilkerson's existing

107

regimen of pain medications.    Hammer's own statement confirms Silver submitted no MWAP forms for MS Contin for eighteen months (from August 2019 through approximately December 2020).    (Hammer 56.1 ¶ 68 (undisputed).)    Ultimately, a reasonable jury could conclude that a blanket denial of opioid pain management to a chronic sickle cell patient objectively deprived Wilkerson of adequate medical care for a serious condition that consigned him to years of pain and unnecessary side effects from alternative medications that were prescribed.

Hammer argues that his subjective belief that the cheeking occurred justified the denials, that the supposed cheeking demonstrated Wilkerson "truly did not need that medication, as he would have otherwise taken his medication instead of cheeking it" (Hammer 56.1 ¶ 54), and that the MWAP Policy required discontinuation when an inmate was "found or suspected to be diverting" controlled substances (23-cv-3397, dkt. no. 157-31, Kiley Decl. Ex. M).    Hammer also offers various rationales for his refusal to approve opioid prescriptions, including purported dosage concerns, the short-acting nature of Percocet, the PRN schedule, and the principle of starting at the lowest effective dose.    (Hammer 56.1 ¶¶ 30-40.)

While these arguments may be properly made before a jury to explain Hammer's denials of treatment, they do not entitle Hammer to summary judgment on this record.    The cheeking defense rests on

108

a single alleged incident, which is itself disputed by Wilkerson's sworn testimony and the corroborating affidavit of eyewitness Tolliver. Even crediting the cheeking allegation, a reasonable jury could conclude that denying all opioid pain management to a chronic sickle cell patient, over the express recommendation of the hematologist Hammer himself directed Wilkerson's providers to consult (in August 2019), was grossly disproportionate and/or pretextual. Whether the cheeking incident occurred, and whether Hammer's response was a genuine exercise of clinical judgment or a pretext for blanket policy application, are questions of fact that must be resolved by the jury.

A reasonable jury could further conclude that Hammer was subjectively aware of the risks to Wilkerson's wellbeing when he denied Wilkerson access to opioids purely on account of the MWAP policy. Among other things, Hammer was aware that Wilkerson's hematologist had recommended that Wilkerson continue treatment on MS Contin, which Hammer apparently opted to disregard. To be sure, Hammer left wiggle room, noting that Silver had room to exercise his "judgment" in opting how to proceed. But a reasonable jury could equally infer that Hammer's initial denial of the MWAP was a fait accompli, as evidenced by Silver's apparent reluctance to submit MWAPs that he believed would not be approved by Hammer.

Finally, qualified immunity does not shield Hammer at this stage because there are triable issues of fact as to whether

109

Hammer's treatment decisions were objectively reasonable.  See Daniels, 2025 WL 949842, at *27; Husain, 494 F.3d at 133.

Accordingly, Dr. Hammer's motion for summary judgment in 23-cv-3397 is DENIED.

### 2.    Defendant Silver: Denied

For similar reasons, summary judgment is denied as to Defendant Silver.  It is undisputed that Silver prescribed Ibuprofen in place of the controlled medications that were discontinued (in July 2019).  (Silver/Burke 56.1 ¶ 132; 23-cv-3397, dkt. no. 155, Silver Decl. ¶¶ 85, 112.)  The record is replete with evidence that these substitutes were ineffective. (Kiley Decl. Ex. K at *1726, 1832, 1849; Ex. L at *21, 23.)  But Silver nonetheless did not submit a single formal MWAP for MS Contin until January 2021, apparently out of recognition that it was likely to be denied by Hammer.  On these facts, a reasonable jury could find that Silver's substitution of Ibuprofen and Tylenol for chronic opioid therapy constituted a sufficiently serious and objectively unreasonable deprivation of medical care.

On the subjective prong, Silver argues—as does Hammer—that the cheeking incident justified the denial of opioid treatment, and that he was powerless to do anything further after Hammer declined to approve the MWAP requests (in July 2019).  Silver asserts that upon learning from Hammer's email that Wilkerson had

been caught cheeking, he "certainly agree[d] that that would disqualify him from receiving" opioid medications.  (Hammer 56.1 ¶ 61 (undisputed).)  Silver further asserts that the MWAP Policy left him no avenue to override or appeal Hammer's decision. (Silver/Burke 56.1 ¶¶ 147, 152-156.)

For the same reasons noted in the Court's discussion of the claims against Dr. Hammer, the record shows substantial triable issues as to whether the cheeking operated as a genuine clinical concern for Silver or merely a convenient justification for abandoning further advocacy.  Once again, the cheeking defense rests on a single alleged incident that Silver did not observe and learned of only through Hammer's email (on August 5, 2019)—in which Hammer himself acknowledged a "justifiable basis" exception and invited Silver to "use your judgment weighing the facts."  (Hammer 56.1 ¶¶ 50, 58 (undisputed).)  Once again, a reasonable jury could find that a single, disputed cheeking allegation was a grossly disproportionate basis for Silver to cease all efforts to obtain opioid pain management for a chronic sickle cell patient— particularly where the hematologist had specifically recommended opioids and Silver himself acknowledged the substitute Ibuprofen regimen was inadequate by requesting opioid reinstatement from Hammer in August 2019.

To be sure, Silver's apparent admission that he was "sympathetic and apologetic" toward Wilkerson and was retiring

111

"because he felt powerless in his ability to treat patients due to DOCCS policies" (Silver/Burke 56.1 ¶ 390 (undisputed)) may well support Silver's good intentions at trial. But the same statements could be equally construed as admissions that Silver knew his patient was suffering due to DOCCS' arbitrary MWAP policy. Whether these statements are evidence of goodwill or an admission of liability is ultimately a question that the jury must decide.

Finally, Silver's argument that he was not personally involved in the alleged denial of Wilkerson's care is equally unavailing. As noted, in his capacity as Wilkerson's assigned PCP at GHCF, Silver personally reviewed Dr. Asif's hematology recommendations (on August 5, 2019), personally emailed Hammer regarding opioid reinstatement (on the same date), directed PA Infantino's prescribing, and personally declined further action after Hammer's denial. (Hammer 56.1 ¶¶ 47–61; Silver/Burke 56.1 ¶¶ 140, 157–158, 162.) At this stage, the evidence of Silver's personal involvement is sufficient to survive summary judgment.

For the same reasons articulated above, qualified immunity does not shield Dr. Silver at this stage given the questions of fact that turn on the objective reasonableness of his decisions. These are necessarily questions that must be decided by the jury. And a reasonable jury could conclude that Silver's treatment decisions were objectively unreasonable. Daniels, 2025 WL 949842, at *27.

112

Accordingly, Dr. Silver's motion for summary judgment in 23-cv-3397 is DENIED.

### 3.    Defendant Burke: Denied

It is undisputed that Wilkerson arrived at Marcy with an active MS Contin prescription (Kiley Decl. Ex. L-3 at *1071–73) and a medical chart reflecting years of specialist recommendations for opioid pain management, including two separate hematologist recommendations for MS Contin 30 mg BID.  (See Kiley Decl. Ex. K-4 at 1532; Ex. L-1 at *242.)  Burke reviewed Wilkerson's medical history and labs upon transfer, noting his sickle cell history, avascular necrosis, and other conditions.  (Silver/Burke 56.1 ¶ 411.)  Yet Burke again opted to discontinue Wilkerson's MS Contin prescription and instead place Wilkerson on Tylenol and Ibuprofen from May 20 through May 27, 2022.  (Silver/Burke 56.1 ¶¶ 406–408.)

To be sure, the 7-day duration of Burke's denial is much shorter than the year-plus of denials allegedly inflicted by Hammer and Silver.  A reasonable jury could find, however, that even a 7-day lapse in Wilkerson's treatment constituted a sufficiently serious medical deprivation that rises to the level of deliberate indifference.  Indeed, Wilkerson alleges uniquely aggravating circumstances in Burke's case.  According to Wilkerson's sworn testimony, Burke unequivocally stated that there was "no pain management in the facility," despite acknowledging that Wilkerson's conditions were "textbook" for opioid treatment and

would undoubtedly warrant an MS Contin prescription outside of the prison context.  A reasonable jury crediting this account could conclude Burke discontinued an existing opioid prescription supported by repeated specialist recommendations without any clinical justification. And a reasonable jury could further infer from these statements that an institutional culture of denying pain management to inmates persisted at DOCCS facilities even after the MWAP Policy was rescinded.

For the same reasons, a jury could rationally infer that Burke was subjectively aware that his discontinuation of Wilkerson's prescription was a radical departure from the "textbook" standard of care and thus posed an acute risk to Wilkerson's health. Whether or not Burke actually made these statements, of course, will be a question of credibility that the jury must weight at trial.

Finally, the Court notes that a reasonable jury could infer the necessary subjective intent from Burke's mid-litigation conduct.  As noted above, Burke's chart notes regarding Wilkerson's claimed agreement to replace MS Contin with Ibuprofen and Tylenol are dated May 27—the same day the Court held a conference in the original Allen litigation regarding the denial of opioid medications to Wilkerson.  (Kiley Decl. Ex. L-3 at *1090.)  That same day, Burke reversed course and agreed to prescribe MS Contin to Wilkerson.  While the Court takes no position on the issue at

114

this stage, a reasonable jury could infer from the allegedly back-dated entries in Burke's chart that Burke initially withheld treatment, reversed course after the issue was raised to the Court, and created post-hoc chart entries to offer a pretext for the previous denial of care.

For the same reasons as those discussed with respect to Hammer and Silver, qualified immunity cannot shield Burke at this stage in that there are questions of fact that turn on the objective reasonableness of his decision to discontinue Wilkerson's treatment.  Daniels, 2025 WL 949842, at *27.

Accordingly, Dr. Burke's motion for summary judgment in 23-cv-3397 is DENIED.

## V.    Conclusion

For the seasons set out above:

- In Allah v. Dinello et al., 23-cv-3286, summary judgment is DENIED for all four Defendants.

- In Alston v. Mueller et al., 23-cv-3290, summary judgment is DENIED for Defendant.

- In Batista-Cruz, as administratrix of the Estate of Roderick Reyes v. Dinello et al., 23-cv-3315, summary judgment is DENIED for Defendant.

- In Crichlow v. Dinello et al., 23-cv-3386, summary judgment is GRANTED for NP Perez and Dr. Andola.

115

- In <u>Dunbar v. Hammer et al.</u>, 23-cv-3391, summary judgment is DENIED for Defendants.

- In <u>Hale v. Mueller et al.</u>, 23-cv-3396, summary judgment is DENIED for Defendant.

- In <u>Locenitt v. Dinello et al.</u>, 23-cv-3399, summary judgment is GRANTED for NP Zaccagnino and DENIED for NP Corigliano.

- In <u>Miller v. Hammer et al.</u>, 23-cv-3462, summary judgment is GRANTED for Dr. Hammer and DENIED for Dr. Silver.

- In <u>Oleman v. Hammer et al.</u>, 23-cv-3607, summary judgment is GRANTED for PA Infantino and DENIED for Dr. Bentivegna and Dr. Hammer.

- In <u>Perez v. Dinello et al.</u>, 23-cv-3300, summary judgment is GRANTED for NP Salotti and DENIED for Dr. Wright.

- In <u>Van Guilder v. Mueller et al.</u>, 23-cv-3398, summary judgment is GRANTED for Dr. Karandy.

- In <u>Wilkerson v. Hammer et al.</u>, 23-cv-3397, summary judgment is DENIED for all Defendants.

Counsel shall confer and inform the Court by letter no later than April 14, 2026, how they propose to proceed.

116

Finally, the Clerk of the Court shall docket this order in each of the following cases listed below and close each of the docket entries listed below:

1.   23-cv-3286, docket numbers 177 and 182

2.   23-cv-3290, docket number 130

3.   23-cv-3315, docket number 134

4.   23-cv-3386, docket number 131

5.   23-cv-3391, docket number 116

6.   23-cv-3396, docket number 93

7.   23-cv-3399 docket number 176

8.   23-cv-3462 docket numbers 103 and 108

9.   23-cv-3607 docket numbers 108 and 114

10.  23-cv-3300 docket numbers 143 and 150

11.  23-cv-3398, docket number 131

12.  23-cv-3397, docket numbers 151 and 158

**SO ORDERED.**

Dated:    March 31, 2026
          New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge

117